79 F.3d 776
 Fed. Sec. L. Rep. P 99,071, 96 Cal. Daily Op. Serv. 1419,
96 Daily Journal D.A.R. 2427
Shaun WEBSTER and Robert Ligon, Plaintiffs-Appellants,
v.
OMNITRITION INTERNATIONAL, INC.; Jim Fobair; Roger Daley;
Charles Ragus; and Jerry Rubin, Defendants-Appellees.
Shaun WEBSTER and Robert Ligon, Plaintiffs-Appellants,
v.
Douglas ADKINS; and Gardere & Wynne, Defendants-Appellees.
 Nos. 94-16477, 94-16478.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Sept. 12, 1995.
Decided March 4, 1996.
 
 Richard M. Heimann and Karen E. Karpen, Lieff, Cabraser & Heimann, San Francisco, California, for plaintiffs-appellants.
 William Christopher Carmody, Dallas, Texas; Robert T. Sullwold, Orrick, Herrington & Sutcliffe, San Francisco, California; Edward King, San Francisco, California, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California; Saundra B. Armstrong, District Judge, Presiding.
 Before CHOY, BEEZER and DAVID R. THOMPSON, Circuit Judges.
 BEEZER, Circuit Judge:
 
 
 1
 We consider what constitutes an inherently fraudulent pyramid scheme for purposes of several federal antifraud statutes.
 
 
 2
 Shaun Webster and Robert Ligon represent a class of participants (collectively "Webster") in a "multi level marketing" program promoted by Omnitrition International, Inc. ("Omnitrition"). Webster alleges that Omnitrition, Roger Daley, Charles Ragus, James Fobair and Jerry Rubin operated an inherently fraudulent pyramid scheme under both California and federal law. Webster amended the complaint to add as defendants Omnitrition's outside counsel, Douglas Adkins, and his law firm, Gardere & Wynne, L.L.P. (collectively "Attorney Defendants").
 
 
 3
 The district court granted summary judgment in favor of all defendants, holding that Omnitrition's program was not a pyramid scheme as a matter of law. The court also held that the federal securities claims against the Attorney Defendants were barred by the statute of limitations.
 
 
 4
 Webster appeals, claiming that there are disputed issues of material fact as well as errors of law. We have jurisdiction and we affirm in part and reverse in part.
 
 
 5
 * Omnitrition is a corporation which operates a "multi level marketing" program, selling nutritional supplements, vitamins and skin care products. Members of Omnitrition's retail sales force are known as "Independent Marketing Associates" ("IMAs").
 
 
 6
 The first level of IMAs are referred to by Omnitrition as "distributors." There is no charge to become a distributor, and distributors have no quota of products they must purchase or sell. A distributor has the right to buy products at a discount from Omnitrition for use or resale and to recruit others into the program. A distributor can qualify to become a "Bronze Supervisor" by ordering a minimum amount (several thousand dollars) in products, measured by suggested retail price, from Omnitrition in one or two (consecutive) months.[1] In order to remain a supervisor, an IMA must continue to meet the minimum order requirements each month.
 
 
 7
 Bronze Supervisors are entitled to receive a "Royalty Override Bonus" on up to three generations of "downline" supervisors, i.e. people the supervisor recruits who themselves also meet the minimum monthly order requirements to be supervisors. The "Royalty Override Bonus" gives the Bronze Supervisor a 1 to 4% commission on orders placed by downline supervisors. Supervisors and those they recruit must continue to purchase a minimum amount of products each month from Omnitrition to qualify the supervisor for commissions. Beyond the Bronze Supervisor level are Silver, Gold, and Diamond supervisors, who can recruit more supervisors into the program and earn the right to royalties on up to six levels of downline supervisors.
 
 
 8
 Omnitrition has three policies which are supposed to encourage retail sales. First, to order products, IMAs must certify that they have sold at least 70% of products previously purchased. This requirement can be met either by retail sales to end users or by sales to downline IMAs. Second, to qualify to earn commissions on downline orders, supervisors must certify that they have made sales to ten retail customers in the past month. It is undisputed that Omnitrition randomly calls some customers listed by supervisors to confirm that the sales have occurred. Third, if an IMA resigns from the program, Omnitrition will buy back unsold inventory for 90% of invoice price, with the caveat that Omnitrition will only repurchase consumable products that are less than three months old.
 
 
 9
 Fobair, Daley and Ragus are corporate officers of Omnitrition. Rubin, now deceased but appearing by the executor of his estate, was alleged to be involved in the creation and promotion of the marketing program. Adkins, a partner at Gardere & Wynne, is outside counsel and Assistant Secretary of Omnitrition. Adkins appears in a promotional videotape produced by Omnitrition, in which he states that Omnitrition is "not a pyramid scheme," gives advice on how to sell the nutritional products within the constraints of FDA guidelines, and makes other promotional statements concerning Omnitrition.
 
 
 10
 Webster and Ligon are former Omnitrition IMAs. Each filed class actions, Ligon in the Southern District of Texas and Webster in the Northern District of California, on behalf of all IMAs in Omnitrition's program who lost money. The two actions were consolidated in the Northern District of California and the district court certified the class. Webster's amended complaint alleges that Omnitrition's marketing program is actually a fraudulent pyramid scheme violative of federal securities laws, state unfair sales practice and fraud laws and the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1961 et seq.).
 
 
 11
 The district court granted summary judgment for all defendants on the ground that Webster had failed to raise a triable issue of fact as to whether Omnitrition's program was a pyramid scheme; the district court held that Omnitrition's policies designed to encourage retail sales took the program outside the definition of fraudulent pyramid schemes. Most of the remainder of the district court's reasons for granting summary judgment depend on this determination.
 
 
 12
 The district court determined that Omnitrition distributorships were not securities within the purview of the federal securities laws because their return did not depend primarily on the efforts of others. The district court further held that, because the program was not fraudulent, its operation and promotion did not constitute predicate acts under RICO. Finally, the district court determined that Webster had failed to provide evidence of several elements of the state law claims.
 
 
 13
 The district court granted summary judgment to the Attorney Defendants holding that the limitation period of the statute of limitations had expired on the federal securities claims. Webster timely appeals.
 
 II
 
 14
 We review a grant of summary judgment de novo. Atwood v. Newmont Gold Co., 45 F.3d 1317, 1320 (9th Cir.1995). We determine whether the district court correctly applied the relevant substantive law and, viewing the evidence in the light most favorable to the nonmoving party, whether there are genuine issues of material fact. Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994).
 
 
 15
 The central issue is whether Omnitrition's marketing program is a pyramid scheme. Operation of a pyramid scheme constitutes fraud for purposes of § 12(2) of the Securities Act of 1933, § 10 of the Securities Exchange Act of 1934 and various RICO predicate acts. Because the record contains sufficient evidence to present a genuine issue of disputed material fact as to whether Omnitrition promotes a pyramid scheme, we reverse the grant of summary judgment.
 
 A.
 
 16
 Pyramid schemes are said to be inherently fraudulent because they must eventually collapse. See, e.g., S.E.C. v. International Loan Network, Inc., 968 F.2d 1304, 1309 (D.C.Cir.1992). Like chain letters, pyramid schemes may make money for those at the top of the chain or pyramid, but "must end up disappointing those at the bottom who can find no recruits." In re Koscot Interplanetary, Inc., 86 F.T.C. 1106, 1181 (1975), aff'd mem. sub nom., Turner v. F.T.C., 580 F.2d 701 (D.C.Cir.1978).
 
 
 17
 The Federal Trade Commission has established a test for determining what constitutes a pyramid scheme. Such contrivances
 
 
 18
 are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.
 
 
 19
 Id. (emphasis in original). The satisfaction of the second element of the Koscot test is the sine qua non of a pyramid scheme: "As is apparent, the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed." Id. We adopt the Koscot standard here and hold that the operation of a pyramid scheme constitutes fraud for purposes of several federal antifraud statutes.
 
 B.
 
 20
 Omnitrition argues that because it does not charge for the right to sell its products at the "distributor" level, as a matter of law the first Koscot element is not met. We disagree.
 
 
 21
 Omnitrition's argument improperly focuses only on the "distributor" level of Omnitrition's program. The program is unquestionably not a pyramid scheme if only the distributor level is taken into account; the participant pays no money to Omnitrition, has the right to sell products and has no right to receive compensation for recruiting others into the program. The distributor level, however, is only a small part of the entire program. Taking into account the "supervisor" levels, a reasonable jury could conclude the Koscot factors are met here.
 
 
 22
 To become a supervisor, a participant must pay a substantial amount of money to Omnitrition in the form of large monthly product orders. The "payment of money" element of a pyramid scheme can be met where the participant is required to purchase "non returnable" inventory in order to receive the full benefits of the program. In re Amway Corp., 93 F.T.C. 618, 715-16 (1979).[2] In exchange for these purchases, the supervisor receives the right to sell the products and earn compensation based on product orders made by the supervisor's recruits. This compensation is facially "unrelated to the sale of the product to ultimate users" because it is paid based on the suggested retail price of the amount ordered from Omnitrition, rather than based on actual sales to consumers.
 
 
 23
 On its face, Omnitrition's program appears to be a pyramid scheme. Omnitrition cannot save itself simply by pointing to the fact that it makes some retail sales. See In re Ger-Ro-Mar, Inc., 84 F.T.C. 95, 148-49 (1974) (that some retail sales occur does not mitigate the unlawful nature of pyramid schemes), rev'd on other grounds, 518 F.2d 33 (2d Cir.1975). The promise of lucrative rewards for recruiting others tends to induce participants to focus on the recruitment side of the business at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur. Koscot, 86 F.T.C. at 1181. The danger of such "recruitment focus" is present in Omnitrition's program. For example, Webster testified that Omnitrition encouraged him to "get to supervisor as quick as [he] could." Ligon states:
 
 
 24
 [T]he product sales are driven by enrolling people. In other words, the people buy exorbitant amounts of products that normally would not be sold in an average market by virtue of the fact that they enroll, get caught up in the process, in the enthusiasm, the words of people like Charlie Ragus, president, by buying exorbitant amounts of products, giving products away and get[ting] involved in their proven plan of success, their marketing plan. It has nothing to do with the normal supply and demand in this world. It has to do with getting people enrolled, enrolling people, getting them on the bandwagon and getting them to sell product.
 
 
 25
 Omnitrition argues that Webster failed to submit sufficient admissible proof that Omnitrition is a pyramid scheme. We disagree. The mere structure of the scheme suggests that Omnitrition's focus was in promoting the program rather than selling the products. When added to statements from Webster's and Ligon's depositions, plaintiffs have produced sufficient evidence to defeat summary judgment.
 
 C.
 
 26
 To rebut the pyramid allegations, Omnitrition relies heavily on In re Amway Corp., 93 F.T.C. 618 (1979), in which the FTC found Amway was not a pyramid scheme because its policies prevented inventory loading and encouraged retail sales. Id. at 715-16. Omnitrition argues that its formal adoption of policies similar to Amway's was sufficient to support summary judgment. We disagree.
 
 
 27
 The policies adopted by Amway were as follows: (1) participants were required to buy back from any person they recruited any saleable, unsold inventory upon the recruit's leaving Amway, (2) every participant was required to sell at wholesale or retail at least 70% of the products bought in a given month in order to receive a bonus for that month, and (3) in order to receive a bonus in a month, each participant was required to submit proof of retail sales made to ten different consumers. Id. at 716. The Administrative Law Judge ("ALJ") in Amway found as a matter of fact that these policies were enforced by Amway, and, more importantly, that the rules in fact served to encourage retail sales and prevent "inventory loading" by Amway distributors.[3] Id. at 646, 668.
 
 
 28
 Omnitrition has distribution rules modeled on Amway's. However, the existence and enforcement of rules like Amway's is only the first step in the pyramid scheme inquiry. Where, as here, a distribution program appears to meet the Koscot definition of a pyramid scheme, there must be evidence that the program's safeguards are enforced and actually serve to deter inventory loading and encourage retail sales. In Amway, the ALJ made that crucial finding of fact, after a full trial. See id. at 631. Our review of the record does not reveal sufficient evidence to establish as a matter of law that Omnitrition's rules actually work.
 
 
 29
 Further, Omnitrition's rules, while carefully crafted to appear like those in Amway, are weaker in operation. The key to any anti-pyramiding rule in a program like Omnitrition's, where the basic structure serves to reward recruitment more than retailing, is that the rule must serve to tie recruitment bonuses to actual retail sales in some way. Only in this way can the second Koscot factor be defeated. Omnitrition has failed to prove that as a matter of law its rules operate in that manner.
 
 
 30
 First, Omnitrition produced evidence of enforcement only for its ten customer rule. Even assuming that Omnitrition's enforcement measures are effective, it is not clear that these measures serve to tie the amount of "Royalty Overrides" to retail sales. The overrides are paid based on purchases by supervisors. In order to be a supervisor, one must purchase several thousand dollars worth of product each month. That some amount of product was sold by each supervisor to only ten consumers each month does not insure that overrides are being paid as a result of actual retail sales.[4]
 
 
 31
 Second, Omnitrition produced no evidence of enforcement of its 70% rule. It merely states that, in order to place further orders IMAs must "certify" that they have sold 70% of the product they previously ordered. There is no evidence that this "certification" requirement actually serves to deter inventory loading. Importantly, the requirement can be satisfied by non-retail sales to a supervisor's own downline IMAs. This makes it less likely that the rule will effectively tie royalty overrides to sales to ultimate users, as Koscot requires.
 
 
 32
 In addition, plaintiffs have produced evidence that the 70% rule can be satisfied by a distributor's personal use of the products. If Koscot is to have any teeth, such a sale cannot satisfy the requirement that sales be to "ultimate users" of a product.[5]
 
 
 33
 Third, Omnitrition has not shown that it enforces its buy-back rule, or the extent to which Omnitrition has actually repurchased product from disappointed IMAs. In addition, by Omnitrition's own terms, the rule is weaker than Amway's in two particulars: (1) Omnitrition only refunds 90% of the price of the product and (2) Omnitrition will only repurchase consumable products (the majority of what it sells) if they are less than three months old. The latter fact is very significant. The buy-back rule is only effective if it can reduce or eliminate the possibility of inventory loading by insuring that program participants do not find themselves saddled with thousands of dollars worth of unsaleable products. Omnitrition's rule potentially would not achieve this goal for any person who participated in the program for more than three months.
 
 
 34
 Omnitrition misreads Amway as holding that any "multi level marketing" program employing policies like Amway's is not a pyramid scheme as a matter of law. That was not the FTC's holding. The FTC held that Amway was not a pyramid scheme as a matter of fact because its policies were enforced and were effective in encouraging retail sales. This ruling does not help Omnitrition at the summary judgment stage.
 
 
 35
 Omnitrition's Amway defense must fail, at least on summary judgment, because the crucial evidence of the actual effectiveness of its anti-pyramiding distribution rules is missing.
 
 III
 
 36
 We reverse summary judgment for Omnitrition on Webster's securities claims.
 
 A.
 
 37
 In S.E.C. v. Glenn W. Turner Enters., Inc., 474 F.2d 476 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), we declared that investments in a pyramid scheme were "investment contracts" and thus securities within the meaning of the federal securities laws. If Omnitrition's program is a pyramid scheme, investments in the program's supervisor positions are securities.
 
 
 38
 An investment contract is a transaction in which "the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." Id. at 481 (quoting SEC v. W.J. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946)). Omnitrition argues that the success of a participant in its program depends on the participant's own efforts and "hard work." We have rejected a strict interpretation of the "solely from the efforts of others" requirement, however, in favor of a flexible approach that focuses on "whether the efforts made by those other than the investor are the undeniably significant ones." Id. at 482.
 
 
 39
 In Glenn W. Turner, we determined in the context of the "Dare to be Great" pyramid scheme that the fact that investors in the scheme were required to exert some effort did not automatically preclude a finding that the investments were securities. Instead, we focused on the fact that the scheme's promoters controlled the methods by which the product was sold and new members were recruited. The promoters provided the "essential managerial efforts which affect[ed] the failure or success of the enterprise." Id. at 483.
 
 
 40
 The same is true of Omnitrition's program. Plaintiffs claim they were taught to sell Omnitrition's "proven plan of success" and to "catch a wave of return that was far beyond anything that [they] were involved in personally." By the very structure of a pyramid scheme, participants' efforts are focused not on selling products but on recruiting others to join the scheme. Under the reasoning of Glenn W. Turner, this is enough to bring investments in the program within the definition of "investment contracts."
 
 
 41
 If Omnitrition's program involves the sale of securities, Omnitrition is liable under § 12(1) for failing to file a registration statement. Section 12(1) imposes civil liability on one who "offers or sells a security in violation of section 77e." 15 U.S.C. § 77l(1) (1981). Section 77e(c) makes it unlawful "to offer to sell ... any security, unless a registration statement has been filed as to such security ..." 15 U.S.C. § 77e(c) (1981). There is no scienter requirement to § 12(1). Wolf v. Banco Nacional De Mexico, 549 F.Supp. 841, 853 (N.D.Cal.1982), rev'd on other grounds, 739 F.2d 1458 (9th Cir.1984), cert. denied, 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 778 (1985).
 
 B.
 
 42
 The district court concluded that all of the allegedly fraudulent statements Webster attributes to the defendants were statements of opinion not actionable under § 12(2) and Rule 10b-5. We disagree.
 
 
 43
 We have set out a three part test for the determination of when a statement of opinion is actionable under federal securities laws. See In re Apple Computer Sec. Litigation, 886 F.2d 1109, 1113 (9th Cir.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). There, we stated:
 
 
 44
 A projection or statement of belief contains at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. A projection or statement of belief may be actionable to the extent that one of these implied factual assertions is inaccurate.
 
 
 45
 Id.
 
 
 46
 Because there is a material question of fact as to whether Omnitrition's marketing program is a pyramid scheme, there are also material questions of fact regarding whether any of the three Apple factors are met with respect to statements promoting the scheme. If defendants operated a pyramid scheme, the third Apple factor could not be satisfied by any statement implying that participants could make back their investment in the scheme.[6] Pyramid schemes are destined to collapse, and the most recent entrants to lose their money. This fact would always be present to undermine the truth of promotional statements.
 
 C.
 
 47
 We reverse summary judgment for Omnitrition on plaintiffs' § 10 and § 12(2) claims.
 
 
 48
 Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe ..." 15 U.S.C. 78j(b). Securities and Exchange Commission Rule 10b-5 prohibits engaging "in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c). Federal antifraud securities laws are to be construed broadly. Herman & MacLean v. Huddleston, 459 U.S. 375, 386-87, 103 S.Ct. 683, 689, 74 L.Ed.2d 548 (1983).
 
 
 49
 We hold that operation of a pyramid scheme violates 10b-5's prohibition against engaging in an "act, practice or course of business which operates as a fraud or deceit upon any person." A jury could rationally conclude that the promotion of a pyramid scheme demonstrates the necessary fraudulent intent. See In re Software Toolworks, Inc. Sec. Litigation, 50 F.3d 615, 628-29 (9th Cir.) (holding summary judgment on 10b-5 claim to be improper, even in absence of direct evidence of fraudulent intent, where evidence permitted a "reasonable inference" of scienter), cert. denied, --- U.S. ----, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995). Because there is a genuine dispute of material fact as to whether Omnitrition operated a fraudulent pyramid scheme, the district court should not have granted summary judgment on Webster's 10b-5 claims.
 
 
 50
 Section 12(2) imposes civil liability on any person who "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ..." 15 U.S.C. § 77l(2). There is genuine dispute over whether Omnitrition made false statements of fact when it declared Omnitrition was not a pyramid scheme. Even absent such statements, a company which promotes an inherently fraudulent pyramid scheme "omits to state a material fact" for purposes of § 12(2) when it does not explain that the program is bound to collapse.
 
 
 51
 There is a scienter requirement to § 12(2), but defendants bear the burden to prove that they "did not know, and in the exercise of reasonable care could not have known, of such untruth or omission ..." 15 U.S.C. § 77l(2). They have not met this burden at the summary judgment stage.
 
 IV
 
 52
 The district court granted summary judgment for defendants on Webster's civil RICO claims (see 18 U.S.C. § 1962(c) and (d)) on two grounds: The absence of predicate acts and the lack of proof of an "enterprise" beyond the alleged racketeering activity itself. We find there exists a genuine issue of material fact, and therefore we reverse the district court.
 
 A.
 
 53
 Because there is a triable issue of fact as to whether Omnitrition was operating an inherently fraudulent pyramid scheme, there also is a triable issue of fact as to whether Omnitrition's promotion of the scheme and use of the mails and wires in furthering the scheme constituted securities fraud, mail fraud and wire fraud respectively.[7] All of these are predicate racketeering acts sufficient to allow plaintiffs to invoke civil RICO. 18 U.S.C. §§ 1961(1)(B) (mail and wire fraud) and 1961(1)(D) (securities fraud).
 
 
 54
 Omnitrition claims Webster has failed to produce evidence that defendants specifically intended to defraud anyone. Specific intent to defraud may be proven circumstantially, and is ill-suited for adjudication on summary judgment. Ikuno v. Yip, 912 F.2d 306, 310 (9th Cir.1990). Facts showing the creation and operation of a pyramid scheme are indications of specific intent to defraud sufficient to survive summary judgment. See People v. Bestline Products, Inc., 61 Cal.App.3d 879, 132 Cal.Rptr. 767, 788 (1976) (The "vice and quicksand nature of 'endless-chain' transactions ... is so apparent that the promoters must be charged with knowledge of the fraud inherent in it.") (quoting State By Lefkowitz v. ITM, Inc., 52 Misc.2d 39, 275 N.Y.S.2d 303, 315 (N.Y.Sup.1966)); see generally Ikuno, 912 F.2d at 311 (finding for purposes of RICO that the existence of a fraudulent scheme "reveals implied if not express intent to defraud.").
 
 B.
 
 55
 Omnitrition argues that Webster must show the existence of an ascertainable structure of the enterprise apart from the alleged racketeering activity (i.e. the operation of a pyramid scheme).[8] The participation of a corporation in a racketeering scheme is sufficient, of itself, to give the enterprise a structure separate from the racketeering activity: "corporate entities ha[ve] a legal existence separate from their participation in the racketeering, and the very existence of a corporation meets the requirement for a separate structure." United States v. Feldman, 853 F.2d 648, 660 (9th Cir.1988), cert. denied, 489 U.S. 1030, 109 S.Ct. 1164, 103 L.Ed.2d 222 (1989) (citing United States v. Kirk, 844 F.2d 660, 664 (9th Cir.), cert. denied, 488 U.S. 890, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988)). Omnitrition argues a corporation allegedly set up to conduct only illegal activities (e.g. operate a pyramid scheme) cannot be an enterprise with a structure separate from the racketeering activity. This argument misconstrues the nature of the separate structure requirement. See, e.g., United States v. Riccobene, 709 F.2d 214, 223-24 (3d Cir.), cert. denied, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). Wholly unlawful enterprises fall within RICO's provisions. United States v. Tille, 729 F.2d 615, 620 (9th Cir.), cert. denied, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984).
 
 C.
 
 56
 Section 1962(d) prohibits conspiracy to violate RICO. Defendants argue that a corporation cannot engage in a RICO conspiracy with its own officers and representatives. We disagree.
 
 
 57
 In Ashland Oil, Inc. v. Arnett, 875 F.2d 1271 (7th Cir.1989), the court found that intracorporate conspiracies were actionable under RICO, while distinguishing the Supreme Court's contrary ruling in antitrust cases:
 
 
 58
 Since a subsidiary and its parent theoretically have a community of interest, a conspiracy "in restraint of trade" between them poses no threat to the goals of antitrust law--protecting competition. In contrast, intracorporate conspiracies do threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits.
 
 
 59
 Id. at 1281.[9] We agree with the reasoning of our sister circuit, and hold that § 1962(d) applies to intracorporate conspiracies. Cf. United States v. Benny, 786 F.2d 1410, 1416 (9th Cir.) (stating that the corporate form is the "sort of legal shield for illegal activity that Congress intended RICO to pierce"), cert. denied, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986).
 
 V
 A.
 
 60
 Whether Omnitrition's program runs afoul of California's laws against false advertising, unfair business practices and fraud is determined under California's statutory definition of "Endless Chain" marketing schemes. California Penal Code § 327 makes it a public offense for any person to operate
 
 
 61
 any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant. Compensation, as used in this section, does not mean or include payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme.
 
 
 62
 Cal.Penal Code § 327 (West 1995). This definition is equivalent, if not identical, to the Koscot test. Because there is sufficient evidence for a jury to conclude the Omnitrition program fails the Koscot test, there also is a genuine issue of material fact as to whether it is an "Endless Chain" scheme under § 327.
 
 
 63
 Indeed, at least one of the Omnitrition's Amway protections is less salient under the California statute. Omnitrition's "70% Rule" allows supervisors to count products sold at wholesale to their own downlines toward their 70 percent sales requirement. This allows supervisors to be compensated on the basis of sales other than "sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme." Id. This is expressly prohibited by the California statute, while it is only implicit in the Amway "retail sales" defense.B.
 
 
 64
 California Business and Professions Code §§ 17500 et seq. make it unlawful for anyone to use false or deceptive marketing practices. The operation and promotion of an Endless Chain scheme within the meaning of Penal Code § 327 is an inherently deceptive marketing practice, actionable under § 17500. People v. Bestline Products, Inc., 61 Cal.App.3d 879, 132 Cal.Rptr. 767, 789-90 (1976).
 
 
 65
 California Business and Professions Code §§ 17200 et seq. create a cause of action for anyone damaged by the defendant's unfair competitive practices. By statutory definition, any illegal business practice is also unfair. Cal.Bus. & Prof.Code § 17200 (West 1995). Thus, if Omnitrition's scheme violates Penal Code § 327, it is actionable under Business and Professions Code § 17200 et seq.
 
 C.
 
 66
 The existence of a triable issue of fact as to Omnitrition's operation of a pyramid scheme raises triable issues of fact as to Webster's cause of action for common law fraud. The familiar elements of a fraud cause of action are (1) misrepresentations of material fact, (2) knowledge of falsity, (3) intent to induce reliance, (4) justifiable reliance and (5) resulting damage. Cicone v. URS Corp., 183 Cal.App.3d 194, 227 Cal.Rptr. 887, 890 (1986).
 
 
 67
 Evidence that the defendants operated an illegal, inherently fraudulent pyramid scheme raises a material question of fact going to the first three elements. Misrepresentations, knowledge and intent follow from the inherently fraudulent nature of a pyramid scheme as a matter of law. As to justifiable reliance, the defendants have not carried their burden on summary judgment of showing a lack of evidence to prove this element. To the contrary, defendants argue strenuously that their scheme was not fraudulent, and that plaintiffs were justified in relying upon the statements made in the promotional materials. Further, the very reason for the per se illegality of Endless Chain schemes is their inherent deceptiveness and the fact that the "futility" of the plan is not "apparent to the consumer participant." Bestline, 132 Cal.Rptr. at 788 (quoting Twentieth Century Co. v. Quilling, 130 Wis. 318, 110 N.W. 174, 176 (1907)). Finally, there is a triable issue of fact as to damages. Webster testified that he never made back what he put in to the scheme and Ligon testified that he lost approximately $5,000 in the scheme.
 
 VI
 
 68
 The district court granted summary judgment for the Attorney Defendants on Webster's § 12 and § 10 securities claims because it concluded that the limitation period of the statute of limitations had expired on those claims before the class amended its complaint to add the Attorney Defendants. We agree.
 
 A.
 
 69
 Claims under §§ 12(1) and 12(2) of the Securities Act of 1933 (15 U.S.C. §§ 77l(1) and 77l(2)) must be brought within one year of the plaintiff's discovery of the allegedly illegal sale or false statement, respectively. 15 U.S.C. § 77m. Section 10(b) claims also operate under a one year limitation period. Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991). The plaintiffs' discovery of the statement's falsity is sufficient to start the limitation period running. Winkelman v. Blyth & Co., 518 F.2d 530, 531 (9th Cir.), cert. denied, 423 U.S. 929, 96 S.Ct. 278, 46 L.Ed.2d 257 (1975).
 
 
 70
 Adkins' alleged false statements were made in a videotape published in March of 1992. The class did not amend its complaint to add the Attorney Defendants until November 16, 1993, some twenty months later. The class filed its original complaints on May 22, 1992 (Ligon) and October 14, 1992 (Webster), both more than one year before the Attorney Defendants were added. Both complaints necessarily alleged that Omnitrition's program was a pyramid scheme. By implication, therefore, plaintiffs knew of the alleged falsity in Adkins' statements that the program was not a pyramid scheme. At the latest, the statute of limitations began to run when Webster filed his complaint on October 14, 1992, more than a year before the class filed suit against the Attorney defendants under § 12(2) and § 10(b).
 
 
 71
 Webster makes no claim that Adkins engaged in any specific individual conduct in violation of § 12(1), rather alleging that all defendants, severally and in concert, engaged in a continuous course of conduct to sell Omnitrition securities in violation of the registration provisions of 15 U.S.C. § 77e.[10] It is undisputed that, more than one year before filing suit against the Attorney Defendants, plaintiffs knew of the Attorney Defendants' participation in Omnitrition and its promotional activities, and knew that Omnitrition had not registered its alleged securities with the Securities and Exchange Commission. The limitations period began to run more that one year prior to the class' amendment to add the Attorney Defendants, and therefore this claim was untimely.
 
 B.
 
 72
 We also affirm the grant of summary judgment for the Attorney Defendants on the RICO claims.
 
 
 73
 Adkins is not liable under RICO because he did not "participate in the operation or management" of the alleged RICO enterprise. See Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). In Reves, the Supreme Court refused to hold an accountant who audited company reports "participate[d] in the operation or management of the enterprise" as required for § 1962(c) liability. Id. at 184-86, 113 S.Ct. at 1173-74. Following Reves, we stated that an attorney who wrote letters, prepared a partnership agreement, and assisted in a Chapter 7 proceeding, failed the "operation or management" test. Baumer v. Pachl, 8 F.3d 1341 (9th Cir.1993).
 
 
 74
 Adkins had far more involvement in the operation and management of Omnitrition than the defendants in the cases he cites. The attorney in Baumer "at no time held any formal position in the limited partnership. Nor did he play any part in directing the affairs of the enterprise." Id. at 1344. By contrast, Adkins was an Assistant Secretary of Omnitrition. Adkins states, however, that his role as officer was "purely ministerial in nature." We agree with the district court that Webster has not produced any facts which refute this assertion. Adkins' statements allegedly promoting the scheme do not constitute participation in the "operation or management" of the enterprise. We find that Adkins' purely ministerial role as "Assistant Secretary" in the corporation is insufficient to warrant liability under § 1962(c).
 
 
 75
 We also find Webster has produced no evidence showing the Attorney Defendants conspired to violate RICO. See 18 U.S.C. § 1962(d). Adkins' statements promoting Omnitrition do not establish that he conspired to participate in the operation or management of the enterprise, as prohibited by § 1962(c). Webster has not alleged that the Attorney Defendants conspired to violate § 1962(a) or (b).
 
 C.
 
 76
 We reverse the district court's summary judgment in favor of the Attorney Defendants on the state law claims under California Business and Professions Code §§ 17200, 17500 et seq., and California common law fraud.
 
 
 77
 Unlike Omnitrition, Adkins' section § 17200 liability cannot be based on violating Cal. Penal Code § 327. Section § 327 only punishes one who "contrives, prepares, sets up, proposes, or operates" an endless chain scheme. Similar to our Reves analysis above, we hold Adkins did not have the requisite involvement in the scheme to warrant § 327 liability.
 
 
 78
 Adkins' statements in the Omnitrition video that Omnitrition's profits are driven by retail sales and that Omnitrition could never be considered a pyramid scheme are false and misleading statements if Omnitrition's program is found to be a pyramid scheme. Section 17500 makes it unlawful for any person to make an untrue or misleading advertising statement "which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Section 17200 prohibits unfair competition, which includes untrue or misleading advertising as defined by § 17500. Adkins' statements also are actionable under California common law fraud.
 
 
 79
 The Attorney Defendants ask us to dismiss the state law claims against them for lack of pendent jurisdiction. The district court may, in its discretion, refuse to exercise supplemental jurisdiction after considering 28 U.S.C. § 1366. We will not examine the necessary factors in the first instance.
 
 VII
 
 80
 Because we reverse the grant of summary judgment on other grounds, we decline to reach Webster's challenges to the district court's evidentiary and discovery rulings.[11]
 
 
 81
 The district court's grant of summary judgment for the Attorney Defendants on Webster's securities claims and RICO claims is AFFIRMED. The remainder of the district court's orders granting summary judgment in favor of Omnitrition and the Attorney Defendants is REVERSED, and the case is REMANDED for further proceedings.
 
 
 82
 AFFIRMED IN PART, REVERSED IN PART and REMANDED.
 
 
 
 [1]
 Somewhat cryptically, Omnitrition refers to the amount of products one of its salespeople orders in a month as "Sales Volume." This figure does not represent the amount of products a salesperson has sold at retail, however. It is arrived at by calculating the suggested retail price of products the salesperson bought at wholesale from Omnitrition
 
 
 [2]
 Omnitrition argues that its buy-back rule makes the inventory purchased by supervisors "returnable." We address this argument below in our discussion of Omnitrition's "Amway defense."
 
 
 [3]
 "Inventory loading" occurs when distributors make the minimum required purchases to receive recruitment-based bonuses without reselling the products to consumers
 
 
 [4]
 The same logical criticism could be made of Amway's ten customer rule. It is crucial, however, to keep in mind that Amway's rule was found to be effective as a matter of fact
 
 
 [5]
 Indeed the record indicates that Omnitrition itself does not treat distributors' use of products as retail sales: distributors who purchase products for personal use are not entitled to the same 30 day money back guarantee that is available to other retail customers
 
 
 [6]
 For example, plaintiffs allege and Omnitrition does not dispute that one defendant stated "[t]hat people who join Omnitrition now [in January 1992] will position themselves for great wealth in the 1990's." The class alleges dozens of similar statements
 
 
 [7]
 Mail fraud makes it illegal "to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ..." 18 U.S.C. § 1341. Wire fraud, 18 U.S.C. § 1343, has the same expansive test. An inherently fraudulent pyramid scheme that meets the Koscot factors would fall within these broad definitions of fraud
 Securities fraud violations under 10b-5 and § 12(2) are predicate acts for RICO. See Laird v. Integrated Resources, Inc., 897 F.2d 826, 838 (5th Cir.1990) (10b-5); Metromedia Co. v. Fugazy, 753 F.Supp. 93, 98 (S.D.N.Y.1990), aff'd as amended on other grounds, 983 F.2d 350 (2d Cir.1992), cert. denied, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993) (§ 12(2)). As discussed above, plaintiffs survive summary judgment on these claims.
 
 
 [8]
 The circuits are split on whether RICO requires the existence of an "ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity." United States v. Blinder, 10 F.3d 1468, 1473 (9th Cir.1993) (internal quotations omitted). Because Webster has offered evidence of a separate structure, we find it unnecessary to decide whether a RICO plaintiff can state a cause of action without offering proof of a separate structure
 
 
 [9]
 District courts are split on the issue. Compare Medallion TV Enterprises, Inc. v. SelecTV of California, Inc., 627 F.Supp. 1290, 1301 n. 7 (C.D.Cal.1986) (collecting cases which state a "corporation can only act through its officers and representatives, who cannot conspire with corporation of which they are a part"), aff'd on other grounds, 833 F.2d 1360 (9th Cir.1987), cert. denied, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989), with Ashland Oil, 875 F.2d at 1281 n. 10 (collecting cases to the contrary)
 
 
 [10]
 Section 12(1) (15 U.S.C. § 771(1)) creates a cause of action for anyone who has purchased securities sold in violation of § 77e
 
 
 [11]
 None of the proposed evidence or discovery materials relate to whether Adkins was conspiring to participate in Omnitrition's operation or management, or establish plaintiffs' securities claims were timely filed against the Attorney Defendants