WIENER and COSTA, Circuit Judges,
joined by STEWART, Chief Judge, and ■ DAVIS, SMITH, DENNIS, PRADO, ELROD, SOUTHWICK, GRAVES, HIGGINSON, Circuit Judges:
The Plaintiffs-Appellees brought a civil action under the Racketeer Influenced and Corrupt Organizations Act (“RICO”), 18 U.S.C. §§ 1961-68, alleging that Stream Energy, through its multi-level marketing program, Ignite, as well as a numbér of other defendants, (collectively the “Defendants”) operated a fraudulent pyramid scheme. The Plaintiffs allege that the fraud has caused them financial losses. The district court certified a class of plaintiffs (the “Plaintiffs”), comprising those who lost money participating as Independent Associates (“IAs”) in Ignite’s pro *633 gram. We now review that certification en bane.
I.
Stream Energy sells gas and electricity to customers in- Texas, Georgia, Pennsylvania, Maryland, New Jersey, New York, and the District of Columbia. Ignite is the marketing arm of Stream. Although Stream sells energy to customers, it is not a public utility that directly produces energy by owning the energy-producing infrastructure. Instead, it acts more as a middleman, reselling gas and electricity in deregulated energy markets that it buys from actual utilities. According to the Plaintiffs, Stream has realized only small profits on its energy sales, despite its large revenues, because Stream sells energy just above, or sometimes even at, its costs.
Rather than making meaningful profits through its sales, the Plaintiffs contend that Stream is set up like a classic pyramid scheme to make almost all of its money through the recruitment of salespeople. According to the Plaintiffs, it works like this: Stream’s marketing arm, Ignite, operates a multi-level marketing program in which IAs (1) sell energy to customers, and (2) recruit other individuals to join as IAs who in turn sell energy to customers and recruit individuals to join as IAs. Under the IA program, Ignite charges individuals for the right to sell Stream services to customers and to recruit IAs. An IA pays Ignite $329 up front for the right to sell Stream energy and to recruit IAs, and also pays an optional recurring fee for a “Homesite” website that the IA can use to promote his or her Stream business.[1] The putative class members are those individuals who paid to become IAs and lost money.
For each energy customer recruited, Ignite pays the IA a small percentage of that customer’s bill as a commission, known as “Residual Income” or “Monthly Energy Income” (“MEI”). According to the Plaintiffs, however, the far. more lucrative opportunities come from the recruitment of other IAs. Ignite pays IAs “Leadership Income” for recruiting other IAs. When an IA recruits another IA, he or she receives income from both (1) energy sales by that IA and his downline IAs, and (2) recruitment of other IAs by that IA and his downline IAs.
An IA’s success depends primarily on recruiting a “downline” of other IAs who, in turn, recruit other IAs and customers into the Ignite program. As an IA recruits more IAs, he proceeds up a ladder of Ignite leadership positions. All IAs start out as “Directors,” the lowest level of Ignite leadership. By recruiting more IAs, an IA can move up three additional leadership levels, first to “Managing Director,” then to “Senior Director,” and finally to “Executive Director.” By building a- downline, the IA also receives MEI for customers whom the downline IAs recruit to join Stream, along with bonuses for the recruitment of IAs both by the first IA' and his downline IAs.
Ignite also promotes a “3&10 program.” Under this program, Ignite pays an IA a $100 bonus if the IA enrolls four customers in the first 30 days. An IA can substitute purchase of the Homesite for two customers, and can be his or her own first customer, in which case that IA needs to recruit only one other customer to receive this bonus. Ignite offers an additional $100 bonus if the IA can obtain six additional customers within sixty days, and a $100 bonus for the first three new IAs that an *634 IA recruits. If an IA recruits another IA who in turn enrolls four customers in his or her first thirty days, Ignite will pay the first IA a third $100 bonus. If the IA recruits two IAs and those recruits each enroll four customers in their first thirty days, Ignite will pay two more $100 bonuses. Ignite calls this the “3&10 program” because it requires an IA to recruit three new IAs and ten new customers (or seven if the IA purchased the Homesite and enrolls his or herself as a customer).
Over time, Stream’s market has become saturated, and the Plaintiffs claim that they have lost money as a result of their participation in the IA program. The Plaintiffs allege that over 86% of individuals who signed up as IAs lost money in fees, collectively losing' over $87 million. In contrast, a miniscule number of individuals have made significant sums of money.
This suit was brought by former IAs Juan Ramon Torres and Eugene Robison, who allege that Stream, Ignite, and various individual defendants have violated RICO. They sought to certify a class consisting of those IAs who have lost money as a result of participating in Ignite’s program. The Plaintiffs sought certification under different theories.
The first was that the Defendants’ common marketing materials were replete with fraudulent misstatements about how lucrative becoming an IA could be, and that—because all class members saw at least one of these statements—the Plaintiffs could show that them injuries arise from a common set of frauds. This theory did not require the Plaintiffs to prove that Ignite is a pyramid scheme; instead, it required only proof of specific misrepresentations.
But they also sought certification under theories that would require the Plaintiffs to prove that Ignite is a pyramid scheme. If they could prove that illegal conduct— and everyone acknowledges that the liability question is common to all class members—then the Plaintiffs contended that they did not need to identify specific misrepresentations on which particular class members relied, as individual reliance is not an element of a RICO claim. Instead, the Plaintiffs contended that RICO’s causation requirement could be satisfied by classwide proof that their joining Ignite was a direct and foreseeable result of the Defendants’ engaging in a pyramid scheme. Proximate cause could also be shown, they argued, through a common sense inference that they were duped into joining the pyramid scheme based on the representation that Ignite is a legitimate enterprise.
In response, the Defendants asserted primarily that the predominance requirement of Federal Rule of Civil Procedure 23(b)(8) is not met because individual issues of reliance will necessarily lead to an individualized causation inquiry under RICO. They also disagreed with the Plaintiffs’ arguments that reliance is not a required element under RICO.
The district court rejected class certification on the Plaintiffs’ theory that depends on specific misrepresentations, concluding that whether the Plaintiffs relied on the array of alleged misrepresentations would require an individualized inquiry. But the court found that class certification was appropriate as to the Plaintiffs’ other theories that depend on common proof of a pyramid scheme. It held that first-party reliance is not an element of a RICO claim predicated on mail or wire fraud, and common proof could establish the proximate cause that is required. Although it focused primarily on the argument that a jury could logically infer that class members joined Ignite based on the implicit representation that it is a legal multi-level marketing program, it also recognized a more *635 direct theory for proving proximate causation on a classwide basis: under the discussion of RICO causation in Bridge v. Phoenix Bond & Indem. Co.,[2] it is enough to show that a “foreseeable and natural consequence” of the allegedly unlawful pyramid scheme is “that the vast majority of the unwitting IAs would lose money.”[3]
The Defendants then filed a petition for interlocutory review with this court under Federal Rule of Civil Procedure 23(f), and a motion to stay proceedings pending resolution of that petition. The district court declined to stay the proceedings, at which time the Defendants filed a motion to stay with this court. This court granted a stay and granted the petition for review in March 2014. The panel majority agreed with the Defendants that individual issues of causation will predominate at trial and reversed the district court’s class certification. We then granted the Plaintiffs’ petition for rehearing en banc.
II.
The narrow issue in this case is whether the Plaintiffs may prove RICO causation through common proof such that individualized issues will not predominate at trial. The import of this inquiry is whether class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3). We emphasize at the outset, and the Defendants conceded at the district court,[4] that whether Ignite’s multi-level marketing program is a fraudulent pyramid scheme is a merits issue subject to common proof. The Defendants might well prove that Ignite is a legal multi-level marketing program. That question, however, is left to be resolved in the first instance at the district court.
' A.
We review a district court’s certification of a class for abuse of discretion, but if the court’s error is a matter of law, the court necessarily abuses its discretion.[5] Our review is deferential “in recognition of the essentially factual basis of the certification inquiry and of the district court’s inherent power to manage and control pending litigation.”[6]
To obtain class certification, the party seeking it must initially comply with Federal Rule of Civil Procedure 23. That party must first satisfy Rule. 23(a)’s requirements of numerosity, commonality, typicality, and adequacy of representation.[7] If successful, that party must next satisfy the provisions of one of Rule 23(b)’s three subsections.[8] Here, the Plaintiffs rely on subsection (3), “which requires that questions of law or fact common to the class predominate over questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the *636 controversy.”[9] “The Rule 23(b)(3) predominance inquiry ■ tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.”[10] The Plaintiffs have the burden of showing that these requirements are met.[11]
The Defendants do not dispute the district court’s Rule 23(a) determination and contend only that it erred in finding Rule 23(b)(3)’s predominance requirement met. “Considering whether ‘questions of law or fact common to class members predominate’ begins, of course, with the elements of the underlying cause of action.”[12]
B.
RICO makes it unlawful to conduct or participate in-an enterprise’s affairs “through a pattern of racketeering.”[13] To bring a RICO claim, a plaintiff must prove: “(1) the identification of a person, who, (2) through a pattern .of racketeering activity, (3) uses or invests income derived therefrom to acquire an interest in or to operate an enterprise engaged in interstate commerce, or acquires, -maintains an interest in, or controls such an enterprise.”[14] The second element, the pattern element, requires “at least two predicate acts of racketeering activity.”[15] Here, the putative class members advance two patterns of racketeering activity: (1) mail fraud in violation of 18 U.S.C. § 1341 and (2) wire fraud in violation of 18 U.S.C. § 1343.
RICO affords a private right of action only to a plaintiff who can show that he or she has been injured “by reason of’ a violation of RICO’s criminal prohibitions.[16] The Supreme Court requires plaintiffs to establish both but-for cause and “proximate cause in order to show injury ‘by reason of a RICO violation.”[17] Proximate cause “should be evaluated in light of its common-law foundations [and] ... requires ‘some direct relation between the injury asserted and the injurious conduct alleged.’”[18] “When a court evaluates a RICO claim for proximate cause, the central question it must ask is whether the alleged violation led directly to the plaintiffs injuries.”[19]
The Defendants’ challenge to predominance rests on their belief that this causation element will require individual *637 ized proof. But that premise, and thus much of their opposition to class certification, is at odds with recent decisions from the Supreme Court and this court emphasizing that RICO claims predicated on mail and wire fraud do not require first-party reliance to establish that the injuries were proximately caused by the fraud.[20]
As the Supreme Court put it in Bridge v. Phoenix Bond & Indemnity Co.: “[A] person can be injured ‘by reason of a pattern of mail fraud even if he has not relied on any misrepresentations.”[21] The Court explained that “[p]roof that the plaintiff relied on the defendant’s misrepresentations may in some eases be sufficient to establish proximate cause, but there is no sound reason to conclude that such proof is always necessary.”[22] It further recognized that “the absence of first-party reliance may in some cases tend to show that an injury was not sufficiently direct to satisfy § 1964(c)’s proximate-cause requirement, but it is not in and of itself dispositive.”[23] At bottom, “the fact that proof of reliance is often used to prove an element of the- plaintiffs cause of action, such as the element of causation, does not transform reliance into an element of the cause of action.”[24] Indeed, “[u]sing the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act óf racketeering under RICO, even if no one relied on any misrepresentation.”[25]
We applied Bridge in St. Germain v. Howard, explaining that “no reliance requirement exists for civil causes of action under RICO for victims of mail fraud.”[26] We relied on the same principle in Allstate Ins. Co. v. Plambeck, noting again that “[i]n eases predicated on mail or wire fraud, reliance is not necessary.”[27] That case involved a group of telemarketing companies, chiropractic clinics, and law offices that convinced not-at-fault car accident victims to obtain chiropractic services so as to receive settlement payments from insurance companies. Allstate alleged that this group of defendants was liable under RICO’s civil fraud statute for racketeering activity involving mail and wire fraud. After a trial, the jury returned a verdict in Allstate’s favor. As to RICO causation, the district court instructed the jury that “proximate cause was present if ‘the injury or damage was either a direct result or a reasonably probable consequence of the act.’ ”[28] The defendants appealed, challenging the jury’s causation determination based on the absence of evidence that Allstate relied on the misrepresentations. We affirmed the verdict, holding that Allstate proved proximate cause because it was a foreseeable victim, and not one “wronged by the caprice of chance”: “The objective of the enterprise was to collect from the insurance companies; the -entire structure of the system ... shows that Allstate’s paying up was not just incidental but was the object of the collaboration.”[29]
*638 Other circuits have adopted similar definitions of proximate causation under RICO. For example, the Sixth Circuit considers whether a direct relationship between the injury and alleged conduct exists, whether the plaintiffs injury is' a foreseeable consequence of the alleged conduct, and whether the casual connection between the injury and alleged conduct is logical and not speculative.[30] The Seventh Circuit looks simply to the “probability of a harm attributable to the defendant’s wrongful act.”[31] The First Circuit, relying on the Supreme Court’s discussion in Holmes v. Securities Investor Protection Corp.,[32] looks to the directness between the injury and alleged conduct with reference to “three functional factors”: (1) concerns about proving damages from attenuated injuries, (2) preventing multiple recoveries, and (3) whether societal interest in deterring the alleged conduct is served by the case.[33] The Fourth Circuit has also held in an unpublished decision that “Bridge’s holding eliminates the requirement that a plaintiff prove reliance in order to prove a violation of RICO predicated on mail fraud” in all contexts, not just third-party reliance cases.[34]
As will be shown below, this understanding of the causation requirement for fraud-based RICO claims—-that such claims, unlike most common law fraud claims, do not require proof of first-party reliance— largely dooms the Defendants’ attempt to identify individual issues of causation sufficient to preclude a finding of predominance.
C.
Under Bridge, the most straightforward way of demonstrating reliance in a class-wide manner is the Plaintiffs’ foreseeability argument.[35] This just requires showing that the Plaintiffs’ losses were caused “by reason of’ the Defendants’ operation of a fraudulent scheme.
That showing could flow directly from a jury’s finding that the Defendants are operating a pyramid scheme as opposed to a lawful multi-level marketing program. Pyramid schemes are “inherent ly fraudulent” and are per se mail fraud, a *639 RICO predicate act.[36] And, by design, a pyramid scheme’s fraud inheres in its concealment of the deceptive nature of the “robbing Peter to pay Paul” payment structure.[37] In fact, the Defendants’ CEO characterized this payment structure in an internal document as a “pyramid” in which “[tjhere are Peters here to rob for the purpose of paying Paul.” SRE.26. The Federal Trade Commission has recognized that a pyramid scheme harms its participants “by virtue of the very nature of the plan as opposed to any dishonest machinations of its perpetrators.”[38] Likewise, the Ninth Circuit recognizes that “[o]peration of a pyramid scheme constitutes fraud for purposes of ... various RICO predicate acts.”[39]
The Federal Trade Commission instructs that a pyramid scheme is characterized by payments by participants in exchange for “(1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to the sale of the product to ultimate users.”[40] The fraud lies in the concealment of the inevitable collapse that results from the scheme’s structure because “[t]he promise of lucrative rewards for recruiting others tends to induce participants to focus on the recruitment side of the business at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur.”[41] That structure, which focuses on recruitment of people, not products, inevitably causes the scheme to collapse when participants run out of individuals to recruit and there are no more new recruits to pay those higher up the pyramid. But “[n]o clear line separates illegal pyramid schemes from legitimate multilevel marketing programs.”[42] Indeed, “the very reason for [their] per se illegality ... is them inherent deceptiveness and the fact that the futility of the plan is not apparent to the consumer participant.”[43]
Because pyramid schemes are per se mail fraud, which include inherent concealment about the deceptive payment scheme, one who participates in a pyramid scheme can be harmed “by reason of’ the fraud regardless of whether he or she relied on a misrepresentation about the scheme. “An inherently fraudulent pyramid scheme ... would fall within the[ ] broad definitions of fraud” under RICO even if no misrepresentations occur.[44] Par *640 ticipants are then harmed by the fraud involved in pyramid schemes not because of any misrepresentations, but because the ultimate collapse of the scheme, and thus harm to participants, is a direct and foreseeable consequence of such structure.
Here, the Plaintiffs allege that the Defendants operated a fraudulent pyramid scheme, which has caused them financial losses. There can be no question that the Plaintiffs are both the direct and foreseeable victims of the alleged fraud. By definition, a pyramid scheme operates by taking money from downline recruits, like the Plaintiffs, who will never recoup their payments, and funneling the money to those at the top of the pyramid. Such schemes depend on “there [being] Peters .,, to rob for the purpose of paying Paul.” Those who lose money in a pyramid scheme necessarily do so “by reason of’ the fraud because the fraud is necessary to temporarily sustain the scheme, and ultimately causes the scheme’s collapse. And, those who profit from a fraudulent pyramid scheme make money only by virtue of the participation of downline investors, like the Plaintiffs, who lose money.
The Plaintiffs are necessary to the scheme and are the direct victims of the scheme. Equally clear is that the Plaintiffs are the foreseeable victims of the alleged fraud: “Pyramid schemes are destined to collapse, and the most recent entrants to lose their money,”[45]
Whether the Plaintiffs relied on a misrepresentation about the scheme is thus not determinative of whether the Plaintiffs can prove proximate causation trader Bridge. As was true in that case, the class members here can prove injury “ ‘by reason of a pattern of mail fraud even if [they have] not relied on any misrepresentations.”[46] The participants’ injuries arise from the scheme’s payment structure, and the inherent concealment of the inevitableness of those injuries.
Further, although a class member’s knowledge that Ignite is an illegal pyramid scheme could serve as an intervening cause that would break the chain of causation,[47] the Defendants, as will be discussed more below, have offered no evidence that any putative class member knew Ignite was an illegal pyramid scheme before joining as an IA. The district court expressly found that the record contained no such evidence, and we find no error in that determination.
Moreover, the directness of the Plaintiffs’ alleged injuries obviates any concerns that might exist in cases with attenuated injuries. As in Bridge, “there are no independent factors that account for [the Plaintiffs’] injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue.”[48]
The Plaintiffs’ claims under this foreseeability theory of proving causation will rise *641 or fall on common evidence. The facts necessary to prove that the Defendants operated a fraudulent pyramid scheme will also suffice to show under Bridge that the fraud caused the Plaintiffs’ injuries. Accordingly, under this theory of causation, individualized issues of causation will not predominate.
D.
We will also address the inference-based theory of causation that was the focus of the panel opinions. We find that this is a separate basis on which to affirm the certification ruling.
Under this theory, the Plaintiffs argue that Ignite’s holding itself out as a legitimate multi-level marketing program, when in fact it was a fraudulent pyramid scheme, gives rise to a reasonable inference that that misrepresentation induced their paying to join as I As and caused their losses. This, the Plaintiffs assert, is because (1) it may be rationally assumed that a precondition for joining Ignite was that it was a legal business opportunity, and (2) the Defendants have offered no evidence of any putative class member who joined or would have joined knowing Ignite was a fraudulent pyramid scheme, in which the majority-of participants are bound to losé money.
We note initially that the Defendants do not challenge whether Ignite represented itself to be a legal multi-level marketing program or whether this question is common to the class. They do not do so for good reason: by operating its program, Ignite has and continues to hold itself out as a legal multi-level marketing program. The Federal Trade Commission’s persuasive precedent recognizes that pyramid schemes make “the inevitably deceptive representation (conveyed by their mere existence) that any individual can recoup his or her investment by means of inducing others to invest.”[49] Pyramid schemes are inherently deceptive because their very structure conceals the fact that those at the bottom of the pyramid will be unable to recoup their investment. Accordingly, we conclude that the misrepresentation at issue here—that Ignite is a legal multilevel marketing program—is subject to common proof and is not even disputed.
We turn next to the question whether the Plaintiffs may employ a common inference of reliance based on that alleged misrepresentation. The Defendants concede that a common inference of reliance is appropriate in some cases. They urge us to adopt a rule requiring that, to invoke an inference of reliance in a fraud case, the Plaintiffs must establish that no rational actor would have participated had they known of the misrepresentation. Other circuits, however, have not applied such a narrow rule. Instead, they have permitted inferences of reliance when it follows logically from the nature’of the scheme, and there is common, circumstantial evidence that class members relied on the fraud.
In Klay v. Humana, Inc.,[50] the Eleventh Circuit upheld the certification of a class of physicians claiming that health maintenance organizations (HMOs) misrepresented that they would pay them for medically necessary services, but instead underpaid them.[51] The Eleventh Circuit affirmed the class certification based on a common inference of reliance on those misrepresentations, explaining that “[a] jury could quite reasonably infer that guarantees concerning physician pay—the very consideration *642 upon which those agreements are based— go to the heart of these agreements, and that doctors based their assent upon them.”[52] Similarly, in In re U.S. Foodser-vice Inc. Pricing Litigation,[53] the Second Circuit held that customers who were allegedly overbilled by a food distributor’s inflated invoices scheme could be certified as a class.[54] It reasoned that “customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice’s implicit representation that the invoiced amount was honestly owed.”[55] Conspicuously absent from both the Eleventh and Second Circuits’ decisions was any requirement that the plaintiffs prove that no other rational explanation existed for their behavior other than reliance.[56]
Given the unfavorable holdings of the courts’ decisions in Klay and U.S. Foodser-vice, it is unsurprising that the Defendants relegated these opinions to a footnote in their en banc briefing. Instead, they urge this court to rely on the Tenth Circuit’s recent opinion in CGC Holding Co. v. Broad & Cassell.[57] That court approved a common inference of i’elianee to certify a class when a class of borrowers alleged that a group of lenders fraudulently extracted nonrefundable loan commitment fees from the borrowers for loans that the lenders never intended to provide.[58] It explained that:
The plaintiffs’ theory of the case rests on a straightforward premise—that no rational economic actor would enter into a loan commitment agreement with a party they knew could not or would not funds the loans. Accordingly, plaintiffs’ payment of up-front fees allows for a reasonable inference that the class members relied on lenders’ promises [to fund their loans], which later turned out to be misrepresentations ....[59]
Although the Tenth Circuit approved the theory of inferred reliance after concluding that no rational actor would join the scheme had he or she known of the fraud, we do not read its opinion as limiting an inference of reliance to that situation. That court’s opinion says only that the absence of another rational explanation for the plaintiffs’ behavior is sufficient to infer reliance—it does not say it is a necessary condition. And tellingly, the Tenth Circuit cited the district court’s opinion in this case approvingly.[60]
*643 Turning to the facts of this case, we conclude that if the Plaintiffs prove that Ignite is a fraudulent pyramid scheme, they may use a common inference of reliance to prove proximate causation under RICO. A jury may reasonably infer that, in deciding to pay to become IAs, the Plaintiffs relied on Ignite’s implicit representation that it is a legal multi-level marketing program, when it is in fact a fraudulent pyramid scheme. Two points support this conclusion.
First, it is reasonable to infer that individuals do not knowingly join pyramid schemes because (1) pyramid schemes are inherently deceptive and operate only by concealing their fraudulent nature; and (2) knowingly joining a pyramid scheme requires the individual to choose to become either a victim or a fraudster. Both points support a reasonable inference that the class members would not have knowingly joined a fraudulent pyramid scheme.
Whether a multi-level marketing program is fraudulent or legitimate depends on its internal structure. And such information is not readily apparent or interpreted. “[T]he very reason for the per se illegality of [such] schemes is their inherent deceptiveness and the fact that the ‘futility’ of the plan is not ‘apparent to the consumer participant.’ ”[61] If a scheme’s illegality were apparent, the scheme would not work. After all, the whole point of a pyramid scheme is to dupe unwitting investors into joining. The sheer improbability that more than a handful of class members (and even a handful seems unlikely) would be able to recognize that Ignite was a fraudulent pyramid scheme before joining as IAs supports the reasonableness of the Plaintiffs’ inference of reliance.[62]
Second, the record is devoid of evidence that a single putative class member joined as an IA despite having knowledge of the fraud. Even after the close of discovery and the commencement of summary judgment motions before the district court, the Defendants produced no evidence that a single class member even knew of the fraud or would have paid to become an IA knowing of the fraud. Faced with this vacuum of evidence, the district court correctly concluded that individual-issues of reliance will not predominate at trial.
The Defendants protest, however, that our pointing to the absence of evidence supporting their defense somehow improperly shifts the burden of proof to them. Not so. The Defendants, while advocating a narrower rule, have now conceded in their en banc brief that the absence of contrary evidence -would support class certification based on an inference of reliance: “To be sure, in cases where a plaintiff has demonstrated that nobody would want the opportunity the defendant is offering, then class certification could be appropriate— absent contrary evidence.” The district court was tasked with determining how a trial would proceed. That court did not simply presume that individual issues of *644 reliance would not predominate; rather, it specifically made this conclusion based on its determination that the Plaintiffs’ case could be made with common evidence. And, in the absence of any evidence showing that individuals joined the pyramid scheme knowingly—the district court correctly ruled that individual issues of reliance will not predominate.[63]
Neither now nor before .the district court have the Defendants even attempted to bear this burden of rebutting the Plaintiffs’ evidence of reliance.[64] On appeal, they do not even contest the district court’s factual finding, which we review only deferentially for an abuse of discretion. Had the Defendants presented evidence that could rebut the Plaintiffs’ common inference of reliance on an individualized basis, we and the district court might have concluded that individual issues of reliance would predominate at trial. In the total absence of such evidence, however, we have no evidentiary basis to conclude that the district court abused its discretion in holding otherwise.
Rather than pointing to evidence, the Defendants rely on speculation alone that a hypothetical class member could have joined as an IA despite knowing of the fraud. But such sheer speculation as to the improbable motivations of an undefined, but likely minute number of class members does not cause individual issues of reliance to predominate. Our inquiry looks to how the trial will proceed;[65] trials are grounded in evidence, not extra-record attorney speculation. As- our sister circuit recognized, “if bald speculation that some class members might have knowledge of a misrepresentation were enough to forestall certification, then no fraud allegations of this sort (no matter how uniform the misrepresentation, purposeful the concealment, or evident plaintiffs’ common reb-anee) could proceed on a class basis.”[66] And mere conjecture that some class members may have acted with knowledge of the misrepresentation seems particularly inappropriate here as anyone who joins a pyramid scheme hoping to become one of the few winners sitting at the top of the pyramid would become liable as a knowing participant.
For these reasons, our result in the instant case is not inconsistent with Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance.[67] There, insureds alleged that insurers charged premiums in excess of approved rates, *645 then misrepresented the correctness of the premiums charged.[68] We rejected class certification because the insureds could not prove proximate causation through common proof. Unlike the Defendants in the instant case, the insurers in Sandmch Chef not only contended that the insureds “were aware that [the insurance] carriers were charging them more than the filed rates,” but also “introduced evidence that ... class members individually negotiated with insurers regarding workers’ compensation and insurance premiums.”[69] Thus, “Knowledge that invoices charged' unlawful rates, ... according to a prior agreement betwéen the insurer and the policyholder, would eliminate reliance and break the chain of causation.”[70] Here, the Defendants have put forth no such evidence.[71]
None of this is to say that if the Plaintiffs prove that Ignite is a fraudulent pyramid scheme, they must necessarily prevail at trial if this inference-theory is advaiiced. The inference of reliance to which' the Plaintiffs are contingently entitled is simply the common mechanism by which they seek to prove their affirmative case. The jury may or may not make this inference in the Plaintiffs’ favor: “[T]he trier of fact is not required to accept the inference; it is merely permitted to utilize it as common evidence to establish the class’s prima fa-cie claims under RICO.”[72] And the district court may revisit its decision and choose to decertify the class should the Defendants eventually produce individualized rebuttal evidence causing their individualized defense to predominate.
But the focus must remain on the predominance inquiry. We thus recognize that even if conjecture alone is sufficient to establish that a few class members might have knowingly joined a fraudulent pyramid scheme, this will not necessarily cause individualized issues of reliance to predominate at trial. In the context of the fraud-on-the-market theory, the Supreme Court’s recent pronouncement in Halliburton Co. v. Erica P. John Fund, Inc. is highly instructive:
While this [argument that an individual plaintiff aware of the fraud would have still bought the stock] has the effect of “leav[ing] individualized questions of re-banee in the case,” there is no reason to think that these questions will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3). That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.[73]
This reasoning applies with equal weight here.[74] Evidence indicating that a few class *646 members decided to take the risk of being a winner in an illegal pyramid scheme does not automatically rebut the inference of reliance for the overwhelming" remainder of class members or mean that individual issues concerning the atypical knowing fraudsters will predominate at trial. This is underscored by the fact that the instant class is comprised of only those who lost money participating in Ignite’s program.
In sum, we' conclude that if the Plaintiffs prove that the Defendants operated' a fraudulent pyramid scheme, a jury may reasonably infer from the Plaintiffs’ payments to join as I As that they relied on Ignite’s implicit representation of legitimacy, when in fact it was a fraudulent pyramid scheme. Although it is not impossible that some class members might have joined as IAs despite knowledge of the fraud, economic speculation alone as to what could have motivated an individual class member is not enough to defeat class certification. Based on the deception inherent in pyramid schemes and the losing proposition that they present to the vast majority of participants, it is highly unlikely that many—if any—of such class members exist. And more importantly, the district court expressly found no evidence indicating that any putative class member knew of the fraud. Because the Defendants failed to demonstrate that such individualized issues will affect even a single class member at trial,, we find no - error in the district court’s conclusion that individualized issues of causation will not predominate. Accordingly, we affirm the district court’s class certification.
III.
The class certification of the district court is AFFIRMED.

. The purchase of the Homesite website was not a requirement to participate as an IA, but many IAs nonetheless purchased it to provide "necessary” exposure to potential customers.

. 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008).

. Torres v. SGE Mgmt. LLC, No. 4:09-CV2056, 2014 WL 129793, at *9 n.13 (S.D. Tex. Jan. 13, 2014) (quoting Bridge, 553 U.S. at 657, 128 S.Ct. 2131).

. At the class certification hearing before the district court, defense counsel categorized the issue of whether Ignite operates a pyramid scheme as "irrelevant” to the issue of class certification.

. Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co., 319 F.3d 205, 218 (5th Cir. 2003).

. Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc., 482 F.3d 372, 380 (5th Cir. 2007) (internal quotation mark omitted) (quoting Allison v. Citgo Petroleum Corp., 151 F.3d 402, 408 (5th Cir. 1998)).

. Fed. R. Civ. P. 23(a).

. Fed. R. Civ. P. 23(b).

. Ahmad v. Old Republic Nat’l Title Ins., 690 F.3d 698, 702 (5th Cir. 2012) (citing Fed. R. Civ. P. 23(b)).

. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-51, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011).

. Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011); see also Castano v. Am. Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996) ("[A] court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.”).

. 18 U.S.C. § 1962(c).

. Crowe v. Henry, 115 F.3d 294, 296 (5th Cir. 1997) (citing 18 U.S.C. § 1962(a), (b)).

. Id. at-297.

. 18 U.S.C. § 1964(c).

. Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 654, 128 S.Ct. 2131, 170 L.Ed.2d 1012- (2008) (quoting Holmes v. Sec. Inv’r Prot. Corp., 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)).

. Hemi Grp., LLC v. City of New York, 559 U.S. 1, 9, 130 S.Ct. 983, 175 L.Ed.2d 943 (2010) (quoting Holmes, 503 U.S. at 268, 112 S.Ct. 1311).

. Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006).

. Bridge, 553 U.S. at 654, 128 S.Ct. 2131; Allstate Ins. Co. v. Plambeck, 802 F.3d 665, 676 (5th Cir. 2015).

. 553 U.S. at 649, 128 S.Ct. 2131.

. Id. at 659, 128 S.Ct. 2131.

. Id.

. Id. (quoting Anza, 547 U.S. at 478, 126 S.Ct. 1991 (Thomas, J., concurring in part and dissenting in part)).

. Id. at 648, 128 S.Ct. 2131.

. 556 F.3d 261, 263 (5th Cir. 2009).

. 802 F,3d 665, 676 (5th Cir. 2015).

. Id.

. Id.

. See Wallace v. Midwest Fin. & Mortg. Servs., Inc., 714 F.3d 414, 419 (6th Cir. 2013); Brown v. Cassens Transp. Co., 546 F.3d 347, 357 (6th Cir. 2008) (applying Bridge and concluding that, the plaintiffs pled proximate cause because "the defendants’ fraudulent acts were a 'substantial and foreseeable cause’ of the injuries”). '

. BCS Servs., Inc. v. Heartwood 88, LLC, 637 F.3d 750, 759 (7th Cir. 2011).

. 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

. In re Neurontin Mktg. and Sales Practices Litig., 712 F.3d 21, 35-36 (1st Cir. 2013).

. Biggs v. Eaglewood Mort., LLC, 353 Fed.Appx. 864, 867 (4th Cir. 2009).

. Although the panel found that the Bridge theory was forfeited (Majority Opinion at 637), we reach a different conclusion. The only "concession” the Plaintiffs made in their original briefing to the panel was simply a worst-case-scenario alternative argument: "Plaintiffs maintained below that Bridge marked an important change by moving the lens from reliance to proximate cause, But that proposition is irrelevant because, as defendants acknowledge ... the district court agreed with defendants and applied a reliance theory of proximate cause in this case.” The alternative nature of that argument is evident from the several pages in both the Plaintiffs' panel and en banc briefing advancing this Bridge-based causation theory. We thus find this issue is not forfeited.
And, as noted above, in certifying the class, the district court adopted both the Bridge argument and the argument that a classwide inference of reliance was permissible. It seemed to combine the two. We will address each theory on its own as either one seems sufficient.

. See Webster v. Omnitrition Int’l, Inc., 79 F.3d 776, 781 (9th Cir. 1996); United States v. Gold Unlimited, Inc., 177 F.3d 472, 484 (6th Cir. 1999) ("Unquestionably, an illegal pyramid scheme constitutes a scheme to defraud.”).

. See In re Koscot Interplanetary, Inc., 86 F.T.C. 1106, 1181-82 (1975) (recognizing that "the right to sell product in an entrepreneurial chain is also likely to prove worthless for many participants, by virtue of the very nature of the plan as opposed to any particular dishonest machinations of its perpetrators”); see also Webster, 79 F.3d at 781 (recognizing that “the operation of a pyramid scheme constitutes fraud” and stating that "[m]isrepre-sentations ... follow from the inherently fraudulent nature of a pyramid scheme as a matter of law” (emphasis added)).

. In re Koscot, 86 F.T.C. at 1182.

. Webster, 79 F.3d at 781.

. In re Koscot, 86 F.T.C. at 1180.

. Webster, 79 F.3d at 782; see also id. at 784 ("By the very structure of a pyramid scheme, participants’ efforts are focused not on selling products but on recruiting others to join the scheme.”).

. Gold Unlimited, 177 F.3d at 475.

. Webster, 79 F.3d at 788 (citation and quotation marks omitted).

. Id. at 788, 789, & n.7.

. Id. at 785.

. Bridge, 553 U.S. at 649, 128 S.Ct, 2131; see also Kerrigan v. ViSalus, Inc., 112 F.Supp.3d 580, 607 (E.D. Mich. 2015) (noting that the plaintiff's "mail and wire fraud allegations do not rest upon misrepresentations” but only on the operation of the pyramid scheme, which "as a matter of law, constitutes a scheme to defraud in violation of the mail and wire fraud statutes”).

. Bridge, 553 U.S. at 659, 128 S.Ct. 2131 (“[I]f the county knew petitioners’ attestations were false but nonetheless permitted them to participate in the auction, then arguably the county's actions would constitute an intervening cause breaking the chain of causation between petitioner’s misrepresentations and respondents’ injury.”).

. Id. at 658, 128 S.Ct. 2131.

. In re Koscot Interplanetary, Inc., 86 F.T.C. 1106, 1181 (1975) (emphasis added).

. 382 F.3d 1241 (11th Cir. 2004).

.Id. at 1259-61.

. Id. (emphasis added).

. 729 F.3d 108 (2d Cir. 2013).

. Id. at 122.

. Id. at 120 (quoting Klay, 382 F.3d at 1259).

. See Klay, 382 F.3d at 1259 (requiring only a “reasonabl[e] inference]"); U.S. Foodser-vice, 729 F.3d at 120-22 (requiring only a common inference of reliance and rejecting mere conjecture about whether class members would have overpaid anyway even if they knew of fraud). In contrast, the narrower standard proposed by Ignite could not be applied to the facts of Klay or U.S. Foodser-vice given that we can easily imagine reasons why the physicians in Klay would have assented to the underpayments with full knowledge of the misrepresentation (for example, the need to maintain access to the HMOs’ patients), or why the customers in U.S. Food-service might have paid the overstated bills (for example, a desire to maintain their business relationships).

. 773 F.3d 1076 (10th Cir. 2014)

. Id. at 1080.

. Id. at 1081, 1091-92 ("More specifically the fact that' a class member paid the nonrefundable up-front fee in exchange for the loan commitment constitutes circumstantial proof of reliance on the misrepresentations and omissions regarding Hutchens's past and the defendant entities' ability or intent to actually fund the promised loan.”).

. Id. at 1091 n.8.

. Webster v. Omnitrition Int’l, Inc., 79 F.3d 776, 788 (9th Cir. 1996) (quoting People v. Bestline Prods., Inc., 61 Cal.App.3d 879, 132 Cal.Rptr. 767, 788 (1976)).

. Notably, the representation that Ignite was a legal multi-level marketing scheme, which was a precondition to class members’ participation in this financial transaction, is distinguishable from the misrepresentations involving consumer purchases in which courts have rejected an inference of reliance. See, e.g., McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 225 & n.7 (2d Cir. 2008) (rejecting an inference of reliance in a case involving the consumer purchase of light cigarettes because individuals purchase light cigarettes for a number of reasons, but recognizing that “a financial transaction does not usually implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase”).

. See Webster, 79 F.3d at 788 ("As to justifiable reliance, the defendants have not carried their burden on summary judgment of showing a lack of evidence to prove this element. To the contrary, defendants argue strenuously that their scheme was not fraudulent, and that plaintiffs were justified in relying upon the statements made in the promotional materials.").

. Notably, the Plaintiffs are not required to prove the negative fact that they did not have knowledge of the fraud: "The plaintiff doesn’t have to prove a series of negatives; he doesn't have to 'offer evidence which positively exclude[s] every other possible cause BCS Servs., 637 F.3d at 757 (quoting Carlson v. Chisholm-Moore Hoist Corp., 281 F.2d 766, 770 (2d Cir. 1960) (Friendly, J.)).

. See Sandwich Chef, 319 F.3d at 220 ("Certification of a class under Rule 23(b)(3) requires that the district court consider how the plaintiffs' claims would be tried.”).

. U.S. Foodservice, 729 F.3d at 122; see also Pub. Emps.’ Ret. Sys. of Miss. v. Merrill Lynch & Co., 277 F.R.D. 97, 119 (S.D.N.Y. 2011) ("Sheer conjecture that class members 'must have’ discovered [the misrepresentations] is insufficient to defeat Plaintiff’s showing of predominance when there is no admissible evidence to support Defendant's assertions.”).

. 319 F.3d 205 (5th Cir. 2003). We also note that to the extent it believed RICO requires proof of individualized reliance, Sandwich Chef is overruled by Bridge.

. Id. at 224.

. Id. at 220 (emphasis added); see. id. at 216 ("In concluding that individual issues predominate in this cdse, we have relied on' evidence that defendants maintain shows that Wall Street and other potential class members, directly or through others, negotiated premiums that varied from filed rates, and that they were aware that carriers were charging them more than the filed rate.”).

. Id. at 220.

. See U.S. Foodservice, 729 F.3d at 120 (distinguishing our precedent in Sandwich Chef because there, the record contained "no such individualized proof indicating knowledge or . awareness of the fraud by any plaintiffs”).

. CGC Holding Co., 773 F.3d at 1093.

. - U.S. -, 134 S.Ct. 2398, 2412, 189 L.Ed.2d 339 (2014) (second alteration in original) (internal citation omitted).

. This principle that a small number of anomalous class members should not defeat predominance is not unique to securities fraud cases. The Supreme Court made a similar pronouncement last term in an opinion ad *646 dressing an overtime time class action. See Tyson- Foods, Inc. v. Bouaphakeo, — U.S. —, 136 S.Ct. 1036, 1045, 194 L.Ed.2d 124 (2016) (“When ‘one or more of the central - issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" (quoting 7AA Wright & Miller § 1778)).