# United States Court of Appeals
# for the Federal Circuit

---

**CHANGZHOU TRINA SOLAR ENERGY CO., LTD., TRINA SOLAR (U.S.) INC., YINGLI GREEN ENERGY HOLDING COMPANY LIMITED, YINGLI GREEN ENERGY AMERICAS, INC.,**
*Plaintiffs-Appellants*

**WUXI SUNTECH POWER CO., LTD., SUNTECH AMERICA, INC., SUNTECH ARIZONA, INC.,**
*Plaintiffs*

**v.**

**UNITED STATES INTERNATIONAL TRADE COMMISSION, SOLARWORLD AMERICAS, INC.,**
*Defendants-Appellees*

---

2016-1053

---

Appeal from the United States Court of International Trade in No. 1:13-cv-00014-RKE, Senior Judge Richard K. Eaton.

---

Decided: January 22, 2018

---

NEIL R. ELLIS, Sidley Austin LLP, Washington, DC, argued for plaintiffs-appellants.

MARY JANE ALVES, Office of the General Counsel, United States International Trade Commission, Washington, DC, argued for defendant-appellee United States International Trade Commission. Also represented by ANDREA C. CASSON, DOMINIC L. BIANCHI.

TIMOTHY C. BRIGHTBILL, Wiley Rein, LLP, Washington, DC, argued for defendant-appellee SolarWorld Americas, Inc. Also represented by TESSA V. CAPELOTO, LAURA EL-SABAAWI, USHA NEELAKANTAN.

———————————

Before TARANTO, PLAGER, and CHEN, *Circuit Judges.*

TARANTO, *Circuit Judge.*

Changzhou Trina Solar Energy Co., Ltd., and Yingli Green Energy Holding Company, Ltd., are Chinese producers of crystalline silicon photovoltaic cells, modules, laminates, and panels (CSPV products). Those products were imported into the United States and were the "subject imports" in the proceeding at issue here. Trina Solar (U.S.), Inc., and Yingli Green Energy Americas, Inc., imported the subject imports into the United States. The two producers and two importers—collectively, the Chinese Respondents—are appellants in this court.

On October 19, 2011, appellee SolarWorld Americas, Inc., filed petitions seeking imposition on the subject imports of antidumping duties under 19 U.S.C. §§ 1673–1673h and countervailing duties under 19 U.S.C. §§ 1671–1671h. The U.S. Department of Commerce eventually agreed with SolarWorld that the subject imports were being sold in the United States at less than its fair value and were being unfairly subsidized by the Chinese government. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical*

*Circumstances, in Part***,** 77 Fed. Reg. 63,791 (Oct. 17, 2012) (*Commerce Antidumping Duty Determination*); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 Fed. Reg. 63,788 (Oct. 17, 2012) (*Commerce Countervailing Duty Determination*). The International Trade Commission, performing its role in the statutory process for imposition of duties, then determined that "an industry in the United States is materially injured by reason of imports of crystalline silicon photovoltaic ('CSPV') cells and modules from China that [Commerce] has determined are subsidized and sold in the United States at less than fair value." *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. Nos. 701-TA-481 and 731-TA-1190), USITC Pub. 4360, at 3 (Nov. 2012) (Final) (*ITC Final Decision*); *Crystalline Silicon Photovoltaic Cells and Modules from China*, 77 Fed. Reg. 72,884 (Dec. 6, 2012).

The Chinese Respondents appealed the Commission's determination to the United States Court of International Trade. As relevant here, they argued that the Commission had not properly found the required causal connection between the unfairly priced or subsidized imports and the weakened state of the domestic industry that it identified as "materially injured by reason of" the imports. The Court of International Trade rejected the challenge and sustained the Commission's determination. *Changzhou Trina Solar Energy Co., Ltd. v. U.S. Int'l Trade Comm'n*, 100 F. Supp. 3d 1314, 1331–32, 1349 (Ct. Int'l Trade 2015).

The Chinese Respondents timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(5). We review the Commission's determination using the same standard as the Court of International Trade: we ask whether it was "unsupported by substantial evidence on the record, or

otherwise not in accordance with law." *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1369 (Fed. Cir. 2015) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  We affirm.

I

Congress has directed the federal government, in defined circumstances, to impose antidumping duties on "foreign merchandise . . . being, or . . . likely to be, sold in the United States at less than its fair value."  19 U.S.C. § 1673(1).  Congress has likewise directed the government, in defined circumstances, to impose countervailing duties on "merchandise imported, or sold (or likely to be sold) for importation, into the United States" for which "the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export" of that merchandise.  *Id.* § 1671(a)(1).  This case involves a requirement of both regimes.

Each regime divides the authority to make the required judgments between Commerce and the Commission.  Commerce determines the existence of the unfair pricing or subsidies—for antidumping duties, "whether the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value," *id.* § 1673d(a)(1); *see also id.* § 1673(1); for countervailing duties, "whether or not a countervailable subsidy is being provided with respect to the subject merchandise," *id.* § 1671d(a)(1); *see also id.* § 1671(a)(1).  The Commission determines, for both kinds of duties, whether

> (A) an industry in the United States—(i) is materially injured, or (ii) is threatened with material injury, or (B) the establishment of an industry in the United States is materially retarded, by reason of imports, or sales (or the likelihood of sales) for importation, of the merchandise

for which Commerce has found unfair pricing or subsidies. *Id.* § 1673d(b)(1) (antidumping duty provision for final determination); *see id.* § 1671d(b)(1) (countervailing duty provision for final determination); *see also id.* §§ 1673(2), 1671(a)(2). For each of the antidumping and countervailing duty regimes, if both agencies answer their assigned questions affirmatively, Commerce issues the duty-imposing order. *See id.* §§ 1673d(c)(2), 1671d(c)(2); *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002).

This case involves the Commission's determination that the domestic industry was, in the statutory phrase, "materially injured . . . by reason of imports" of the Chinese Respondents' merchandise. *See ITC Final Decision*, at 3 (finding that domestic industry was "materially injured by reason of" the subject imports). We have noted the two parts of such a finding: that there is "present material injury"; and that "the material injury is 'by reason of' the subject imports." *Gerald Metals, Inc. v. United States,* 132 F.3d 716, 719 (Fed. Cir. 1997). Congress has further specified that, "[i]n making determinations" under the material-injury provisions for both antidumping and countervailing duties,

the Commission, in each case—

(i) shall consider

(I) the volume of imports of the subject merchandise,

(II) the effect of imports of that merchandise on prices in the United States for domestic like products, and

(III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States; and

(ii) may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.

19 U.S.C. § 1677(7)(B); *see also id*. § 1677(7)(C)(i)–(iv) (directing Commission to consider enumerated topics).

The language Congress used—injury "by reason of" specified conduct—is familiar in many legal contexts. Recently, the Supreme Court has repeatedly made explicit that, as a matter of settled ordinary legal meaning, the phrase requires, at a minimum, "but for" causation of the injury by the statutorily identified conduct. *See Burrage v. United States*, 134 S. Ct. 881, 889 (2014) ("the phrase, 'by reason of,' requires at least a showing of 'but for' causation") (citation omitted); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (reasoning that adverse action "because of" age in the Age Discrimination in Employment Act means "by reason of" age, which has a settled meaning, so that "[t]o establish a disparate-treatment claim under the plain language of the ADEA[], a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision"); *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 265–68 (1992) (reasoning that a statute permitting recovery for injuries suffered "by reason of" the defendant's violation "require[s] a showing that the defendant's violation . . . was," among other things, "a 'but for' cause of his injury"); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2527 (2013); *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 652–55 (2008).

A number of courts of appeals have recognized, in various contexts, that the Supreme Court's precedents establish a strong default interpretation requiring but-for causation, at a minimum, when a statute uses "by reason of." *See, e.g., Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 168 (7th Cir. 2017) (referring to

"indicia of Congress's intent to create 'but for' causation—words like 'because' or 'by reason of'"); *Torres v. S.G.E. Mgt., L.L.C.*, 838 F.3d 629, 636 (5th Cir. 2016) (noting that "[t]he Supreme Court requires plaintiffs to establish both but-for cause and 'proximate cause in order to show injury "by reason of" a RICO violation'"); *Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235–36 (4th Cir. 2016) (reasoning that there is no "meaningful textual difference between" the phrase "on the basis of" and the terms "because of, by reason of, or based on [] that the Supreme Court has explained connote 'but-for' causation") (internal quotation marks omitted); *Rogers v. Bromac Title Servs., LLC*, 755 F.3d 347, 352 (5th Cir. 2014) (adopting the Supreme Court's reasoning in *Gross* to conclude that "the plain and ordinary meaning of the [Jury System Improvement Act's] use of 'by reason of' supports a but-for causation standard"); *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 34 (1st Cir. 2013) (following *Holmes*'s conclusion that RICO's "'by reason of' language contains both but-for causation and proximate causation requirements").

Although Congress may use legal terms in unusual ways in particular statutes, "[i]t is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013) (internal quotation marks and citation omitted); *see Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1999 (2016). We see nothing that would justify finding that Congress was departing from the Court-recognized ordinary meaning when it directed the Commission to determine the existence of material injury "by reason of" unfairly priced or subsidized imports in 19 U.S.C. §§ 1673d(b)(1) and 1671d(b)(1). In particular, when Congress further prescribed a set of topics that the Commission "shall consider," it did not change the "by reason of" standard of

§§ 1673d(b) and 1671d(b): it merely identified topics that the Commission must consider "[i]n making determinations" under those "by reason of" provisions. 19 U.S.C. § 1677(7)(B). And it confirmed the maintenance of the "by reason of" standard when it added that the Commission may consider "such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports." *Id.* § 1677(7)(B)(ii). We have been pointed to nothing in the statute that overrides the Supreme Court's rulings that "by reason of" requires, at the least, but-for causation. At oral argument before this court, counsel for the Commission properly agreed that but-for causation is required—though *how* the standard applies may vary with the facts. Oral Arg. at 15:01–16:05.

This conclusion is consistent with our precedents, especially when read in light of the Supreme Court's recent clarification of the default meaning of "by reason of." In *Mittal Steel Point Lisas Ltd. v. United States*, for example, this court stressed the importance, though "not necessarily dispositive" character, of the inquiry into "whether the subject imports are the 'but for' cause of the injury to the domestic industry"—which "requires the finder of fact to ask whether conditions would have been different for the domestic industry in the absence of dumping." 542 F.3d 867, 876 (Fed. Cir. 2008).[1] In support, the court pointed

---

[1] *Mittal*'s statement that but-for causation is "not necessarily dispositive," 542 F.3d at 876, is in accord with the fact that the Supreme Court decisions cited above state that but-for causation is a *necessary* requirement—not that it is always sufficient. Often, "proximate causation" is also required, over and above but-for causation. *See, e.g.*, *Holmes*, 503 U.S. at 268; *Torres*, 838 F.3d at 638; *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d at 34.

to the explanation in the 1994 Statement of Administrative Action (deemed "authoritative" by 19 U.S.C. § 3512(d)) that the Commission must "'ensure that it is not attributing injury from other sources to the subject imports.'" *Mittal*, 542 F.3d at 877 (quoting H.R. Doc. No. 103–316, vol. 1, at 851–52 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4184–85). The court summarized earlier cases that found Commission determinations lacking for insufficient analysis of "whether the domestic industry would have been better off if the dumped goods had been absent from the market." *Id.* at 876; *see id.* at 873–74, 877–79 (discussing *Bratsk Aluminium Smelter v. United States*, 444 F.3d 1369, 1373 (Fed. Cir. 2006), and *Gerald Metals*, 132 F.3d at 722). At the same time, the court explained that this requirement "does not require the Commission to address the causation issue in any particular way." *Id.* at 878. Rather, the court recognized "the Commission's broad discretion with respect to its choice of methodology." *Id.* at 873.

This court's decision in *Swiff-Train Co. v. United States* is to the same effect. 793 F.3d 1355 (Fed. Cir. 2015). The court there accepted the importance of a "proper but-for analysis," which the court held the Commission had conducted when it "established cause-in-fact by identifying the injurious effect of subject imports on the domestic industry using the statutory factors, and then ensuring injury was not caused by factors other than subject imports." *Id.* at 1361. At the same time, the court reiterated propositions from earlier precedents—propositions that are consistent with a but-for causation requirement—that "the Commission need not isolate the injury caused by other factors from injury caused by unfair imports, nor demonstrate the subject imports are the 'principal' cause of injury." *Id.* at 1363 (internal quotation marks and citations omitted). More broadly, the court reiterated that "this court does not require use of any particular model or methodology," *id.* at 1361,

including "an explicit counterfactual analysis," *id.* at 1362, to answer the prescribed causation question. *See also id.* at 1362–63.

In short, the statutory language, Supreme Court precedent, our precedent, and precedent from other circuits together support the conclusion that but-for causation is required under the "by reason of" standards of 19 U.S.C. §§ 1673d(b)(1) and 1671d(b)(1), while *how* the standard is best applied in particular circumstances may vary with the facts. The Commission may use a variety of methods of analysis for applying the standard to the myriad factual situations that may be presented. When facts such as the significant market presence of price-competitive non-subject imports are present, the Commission, to meet its obligation to "examine the relevant data and articulate a satisfactory explanation for its action," must engage in "additional" analysis, beyond what may suffice in the absence of such inquiry-complicating facts relevant to whether, considering other contributors, the subject imports account for material harm to the domestic industry. *Bratsk*, 444 F.3d at 1373, 1375. But the recognition that different facts call for different amounts of explanation in applying the statutory standard does not mean that the standard is different in different cases, any more than does the recognition of methodological discretion in applying the standard. The standard, requiring but-for causation, remains the same. *Cf. Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 535 (2008) (characterizing as "obviously indefensible" the "proposition that a standard different from the statutory" standard applies in a subset of cases covered by the standard). The substance of the Commission's analysis, not the specific formulation employed, determines whether the Commission has adequately answered the question of but-for causation on the particular facts in the matter before it.

II

In this case, the Chinese Respondents contend that the Commission did not adequately address the question of but-for causation. They argue, in particular, that the Commission failed to make findings, supported by substantial evidence, that the domestic industry would have been materially better off than it was during the period of investigation (POI) if the subject imports had not been introduced into the market. We reject that challenge. In substance, the Commission made that determination and had an adequate basis for doing so.[2]

The Commission found "that there is a causal nexus between subject imports and the poor condition of the domestic industry and that the domestic industry is materially injured by reason of subject imports." *ITC Final Decision*, at 38. It relied on findings it summarized as follows:

> [T]he picture emerges of a domestic industry (1) with a steadily declining market share despite phenomenal demand growth, (2) that has lost market share due primarily to the significant and increasing volume of subject imports from China, (3) that has faced significant underselling by subject imports from China and depressed and suppressed prices, (4) that consistently lost money

---

[2] The period of investigation for the Commission was January 2009 through June 2012. *ITC Final Decision*, at 9 n.63. Shorter segments of that period are recited as the periods addressed in Commerce's determinations. *Commerce Antidumping Duty Determination*, 77 Fed. Reg. at 63,792; *Commerce Countervailing Duty Determination*, 77 Fed. Reg. at 63,788. The Chinese Respondents make nothing of that difference in their arguments to this court.

throughout the POI despite the tremendous demand growth and significant cost reductions, (5) that by the end of the POI experienced declines even in many of the performance indicators that previously had shown some improvement, and (6) that reported recognizing asset write-offs and/or costs related to the closure of production facilities, revalued inventories, and/or asset impairments.

*Id.*

Despite those findings, the Chinese Respondents argue that the Commission did not adequately address but-for causation because it insufficiently accounted for three facts about the marketplace in the POI—January 2009 to June 2012. One was the pressure CSPV sellers faced to lower their prices to meet the price at which utilities could buy natural gas for power generation—so-called "grid parity."[3]  A second was the decline in government

---

[3]   The Commission described "the goal for CSPV products to attain grid parity, which largely means matching the levelized cost of natural-gas-generated electricity provided to the grid during peak periods, as discussed above." *ITC Final Decision*, at 34.  The Commission earlier explained:

Electricity providers using renewable energy sources seek to achieve "grid parity" with other sources of electricity (the point at which the levelized cost of electricity generated from renewable sources equals the cost of conventional electricity from the grid).  The levelized cost of electricity varies by region, by time of the day, and by availability of other electricity sources.  During periods of non-peak electricity demand in the United States, only lowest-cost "baseload" generators (traditionally coal and nuclear plants) will be able

subsidies for solar-energy products, making it harder for sellers to offer low prices. The third was the increase in demand in the utility segment of the market, compared to other market segments.

The Chinese Respondents argue that, given the difficulties those facts posed for the domestic industry, the domestic industry would have been materially as badly off (in the POI) even had there been no unfairly priced and subsidized subject imports. More precisely, they argue that the Commission gave inadequate attention to whether the unfairly priced and subsidized subject imports were a but-for cause of any "material injury." Given the statutory definition of "material injury" as "harm which is not inconsequential, immaterial, or unimportant," 19 U.S.C. § 1677(7)(A), the question is whether the Commission found, with adequate reasons and substantial-evidence support, that the difference between the state of the domestic industry as it actually was in the POI and the state of the domestic industry as it would have been without the subject imports was more than inconsequential, immaterial, or unimportant.

We conclude that the Commission so found and had a sufficient basis for so finding. The Commission's summary, quoted above, rested on detailed findings about demand conditions and the business cycle in the domestic

---

to sell electricity to the grid, whereas during peak electricity demand periods, even generators with somewhat higher costs may be able to sell electricity into the transmission or distribution grid. For peak periods, natural-gas generated electricity sets the levelized cost of electricity that CSPV solar systems and other renewable systems must seek to meet, especially for sales to the utility segment.

*Id.* at 21–22 (internal references omitted).

market, the roles of conventional and renewable sources of electricity, government incentives and regulations at federal, state, and local levels, domestic consumption trends, market segments, who was supplying the domestic market, what happened to prices and market shares during the POI, and the ways in which "the domestic industry's financial performance was very poor and deteriorating." *ITC Final Decision*, at 35; *id.* at 21–38. The findings rested on various types of evidence, including the answers to questionnaires addressed to market participants such as purchasers. *Id.* at 30, 32.

The Commission found declining prices of the CSPV products and significant loss of market share to subject imports, despite increasing demand for the products. *Id.* at 31–33, 36–37. And the Commission attributed a material portion of the adverse effects on the domestic industry to the subject imports. It found that "domestic producers lost sales and revenues due to competition from low-priced subject imports" and that "significant underselling of the domestic like product by subject imports from China . . . enabled subject importers to gain market share at the expense of the domestic industry." *Id.* at 33. And it characterized the "very poor and deteriorating" condition of the domestic industry as being "because of the significant volume and adverse price effects of subject imports." *Id.* at 35.

More specifically, the Commission addressed the three facts highlighted by the Chinese Respondents here, and it found that those facts did not account for the domestic industry's woes. Thus, the Commission recognized "there may have been additional factors exerting downward pricing pressure on CSPV products," but it found "that subject imports were a significant cause of the decline in prices of CSPV products during the POI." *Id.* at 33–34. It found that "the impetus toward grid parity fails to explain the significant underselling by subject imports demonstrated on this record." *Id.* at 34. It recognized the

fluctuation of domestic government subsidies during the POI, but it found that, "during much of the POI, the overall mix of incentives was very favorable and stimulated demand substantially" and "a number of incentives remained available" even at the end of the POI. *Id.* at 34–35. It recognized that sales to utilities were "the fastest growing U.S. market segment," *id.* at 32, but it found that "the domestic industry's declining market share was not limited to the utility segment"—"due to consistent and substantial underselling by subject imports, the domestic industry also lost market share in the residential and non-residential segments of the U.S. market, and non-subject imports also lost market share to increasing volumes of low-priced subject imports," *id.* at 37 (internal references omitted). *See also Changzhou Trina Solar Energy Co.*, 100 F. Supp. 3d at 1335–48 (recounting Commission analysis in detail).

The Commission determined:

> We find that the factors Respondents cite, all of which would have affected both the domestic like product and subject imports from China, *do not individually or collectively account for* the substantial margins of underselling by subject imports, the accelerating decline in prices in the U.S. market during the POI, the inability of the domestic industry to price its products at levels that would permit the recovery of its costs during a period of very significant demand growth, or the pace at which subject imports captured additional shares of this growing market at the domestic industry's expense throughout the POI. In sum, the significant and growing volume of low-priced subject imports from China competed directly with the domestic like product, was sold in the same channels of distribution to the same segments of the U.S. market, and undersold the domestic like product at significant margins, causing domestic

> producers to lose revenue and market share and leading to significant depression and suppression of the domestic industry's prices.

*ITC Final Decision*, at 35 (emphasis added). By determining that the facts highlighted by the Chinese Respondents did not account for (materially) all of the domestic industry's weakening during the POI, the Commission in substance made the required determination of but-for causation. And its explanation, relying on concrete evidence that we see no basis for deeming insufficient under the substantial-evidence test, was adequate to support the finding.

## III

For the foregoing reasons, we affirm the judgment of the Court of International Trade.

**AFFIRMED**