# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

December 18, 2019

No. 18-20801

Lyle W. Cayce
Clerk

JUAN RAMON TORRES as Representative of the Estate of Eugene Robison;
CHRISTOPHER ROBISON, as Representative of the Estate of Eugene
Robison; LUCAS ("LUKE") THOMAS, individually and on behalf of a class of
similarly situated individuals,

>           Plaintiffs - Cross Appellants

v.

SGE MANAGEMENT, L.L.C.,

>           Defendant

SCOTT M. CLEARMAN, individually and on behalf of The Clearman Law
Firm, P.L.L.C.,

>           Appellant - Cross Appellee

v.

ANDREW JACK KOCHANOWSKI, individually and on behalf of Sommers
Schwartz, P.C.; ERIC FRANKLIN CITRON, individually and on behalf of
Goldstein; Russell, P.C.; JEFFREY WEST BURNETT, individually and on
behalf of Jeffery W. Burnett, PLLC; MATTHEW J. M. PREBEG, individually
and on behalf of Prebeg, Faucett; Abbott,

>           Appellees - Cross Appellants

THOMAS GOLDSTEIN, individually and on behalf of Goldstein; Russell,
P.C.,

>           Cross Appellant

No. 18-20801

Appeals from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, STEWART, and ENGELHARDT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

After settlement of this class action, the district court awarded approximately $10 million in fees to the plaintiffs' attorneys. At issue here is how the court allocated this award among the attorneys. To split the money, the court adhered to the "spirit" of unconsummated or outdated contracts among the attorneys. The allocation that resulted may well be equitable; we do not reach this question because the trial court explicitly disclaimed the use here of the *Johnson* factors for assessing the reasonableness of fee awards, contrary to our decision in *High Sulfur*.[1] We must vacate the allocation order and remand for elaboration of the trial court's reasoning under the *Johnson* framework.

## I.

Appellant Scott Clearman, who sought half of the total award but received roughly $1,500,000, advances several challenges to the fee allocation. All other class counsel ("Appellees") argue that the allocation is sound, but they

---

[1] *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220 (5th Cir. 2008). These factors, set out in *Johnson v. Ga. Highway Express*, 488 F.2d 714, 717–19 (5th Cir. 1974), are (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the political "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

No. 18-20801

conditionally cross-appeal on the basis that if there is any defect, it is that Clearman received too much.

The underlying litigation began when two distributors for Stream Energy, LLC, retained attorney Jeffrey Burnett because they suspected that Stream's multi-level marketing program was a fraudulent pyramid scheme. Burnett hired Scott Clearman to bring a RICO class action, any fee to be shared 25 percent to Burnett and 75 percent to Clearman. Stream filed successful motions to dismiss in the cases filed in Georgia (dismissal sustained by the Eleventh Circuit[2]) and in Texas (dismissal reversed by this Court[3]). Clearman partnered with Matthew Prebeg to form Clearman Prebeg LLP ("CP"), assigning the prior fee interest of The Clearman Law Firm LLP to CP. With the case revived and class-certification discovery underway, Burnett and CP were joined in the litigation by Andrew Kochanowski and Sommers Schwartz, P.C. ("Sommers"). A new fee agreement was signed: 60 percent to CP (split among its four partners), 20 percent to Sommers, 20 percent to Burnett.

After the joinder of Kochanowski and Sommers, the parties dispute Clearman's involvement. Appellees claim that

> [b]y the time this case became active again in 2011, Mr. Clearman, who was the designated attorney-in-charge, was severely struggling with substance abuse issues. His condition was characterized by extreme paranoia, highly aggressive behavior, delusional thinking, memory loss and the inability to remember important facts, and the inability to accomplish complex, and at times even simple, tasks. At times Mr. Clearman was rational and productive, and at other times he was not. . . . However, as time progressed, the periods of his ability to accomplish tasks diminished, so petitioners were required to monitor his work product to protect the interests of the clients, and reduce the potential for liability.

---

[2] *Betts v. SGE Mgmt., LLC*, 402 F. App'x 475 (11th Cir. 2010).

[3] *Torres v. SGE. Mgmt., LLC*, 397 F. App'x 63 (5th Cir. 2010).

No. 18-20801

Clearman claims he took half the depositions relied on in the class-certification motion, but concedes he did not participate in the class-certification hearing and entered inpatient treatment for alcoholism shortly thereafter. Prebeg was substituted as attorney-in-charge in October 2013. In January 2014, the remaining CP partners formed Prebeg, Faucett & Abbott, PLLC ("PFA") and began winding up CP. Also in January 2014, the district court certified the class and named Clearman, Kochanowski, and Prebeg as co-class counsel.

Kochanowski and Prebeg engaged Goldstein & Russell ("G&R") to defend the class certification against Stream's appeal. Another fee arrangement was reached under which G&R would receive between 16 and 18 percent, depending on the size of the fee award. (The actual award exceeded $8 million, so under these terms G&R would get 16 percent.) Burnett would receive another 17 percent of the total. After the shares of Burnett and G&R were paid, the remainder would be distributed to Sommers (30.67 percent), Clearman (17.34 percent) and PFA (51.99 percent). All attorneys signed the agreement save Clearman. On June 25, 2014, the terms of this new fee agreement were memorialized without Clearman's participation.

Next, although a panel had reversed the district court's class certification, the en banc court reinstated the certification on September 30, 2016.[4] This led to a settlement, which included $10,275,000 million in expenses and fees for class counsel. As directed, counsel filed applications for fees. The non-Clearman attorneys sought a total of $9,056,071.80 in fees and $378,062.01 in expenses, which was $840,866.19 short of the total award. A single fee petition could not be prepared, Kochanowski explained, because of ongoing state-court litigation stemming from CP's dissolution and because

---

[4] 838 F.3d 629 (5th Cir. 2016) (en banc).

No. 18-20801

Clearman did not keep time sheets. Clearman concedes he did not keep contemporaneous hour logs: "I started this case, and I never cared to record my hours as I would rather focus on getting results and being rewarded accordingly." Although they lacked Clearman's cooperation, Appellees contend that "having both the general fee-splitting agreements as a guidepost and cooperating in sharing time records," their fee petitions supported the total award.

Clearman's fee petition sought 50 percent of the fees remaining after expenses, or roughly $5 million. He stated that the other counsel "have written about as much about the law of fees in the Fifth Circuit as could be necessary" and he "will not, for the sake of making myself look smart, repeat what they have each written." In response, the class representatives moved to strike Clearman's fee petition. The representatives claimed his petition valued his time at a lodestar of between 3.5 and 20 times that of any other lawyer and was premised on an hourly rate between $1,700 and $10,000. They challenged Clearman's failure to keep and offer contemporaneous time sheets and his suggestion that the court need not subject his fees to a reasonableness cross-check. The district court then ordered Clearman to resubmit his petition "setting forth time expended and [Clearman's] usual and customary rates[.]"[5] The same day, the court approved the settlement and entered final judgment, retaining jurisdiction over the fee-allocation issue.

Clearman filed a new petition with "reconstructed" time records. Clearman again sought half the fees, and Appellees note several concerns with the revised petition. For example, Clearman revised his "estimate" of 3,000 hours upward to 4,150 hours, now claiming a $950 hourly rate to arrive at his roughly $5 million request. Further,

---

[5] Clearman's motion for reconsideration of this order was unsuccessful.

No. 18-20801

[n]otwithstanding his earlier admissions about his alcoholism, Mr. Clearman now claims to have spent another 2000 or so hours between 2012 and 2015 on this case. That claim is incredible. In his earlier motion, Mr. Clearman submitted a declaration that admitted he was unable to practice, and sought to excuse that circumstance with a declaration by Charles Silver. Now, the Court is asked to believe that Mr. Clearman was hale and hearty in those years, and working 10 hours a day on the case.

Based on these and other irregularities, the class members filed a renewed objection to Clearman's new fee petition.

On November 7, 2018, the district court issued its Order on Allocation of Attorney's Fees and Costs. That order, which is the subject of this appeal, noted that no party contested the previously determined award of fees and costs. Since there was no dispute as to the size of the award, the district court found it "unnecessary to engage in determining the reasonableness of the fee and costs under the *Johnson* fee calculation factors." Turning to proper allocation, the district court described the several iterations of the counsels' fee agreements:

> Initially, the Clearman firm was to receive 75% of any fee recovered and the Burnette [sic] firm would receive 25%. Later, the Sommers firm was engaged as additional counsel and the fee arrangement changed. The Clearman firm would receive 60%, the Burnett firm 20% and the Sommers firm 20%. Later, the Clearman firm split and Scott Clearman left the firm. However, the Prebeg group of the Clearman firm [PFA] continued with the litigation along with the Sommers and Burnett firms, and added the Goldstein firm [G&F] as appellate counsel. Scott Clearman did not join the fee split agreement that resulted. Nevertheless, under this agreement, the Prebeg firm would receive 46%, the Burnett firm 20%, more or less. It was estimated that Clerman [sic] would receive, more or less, one third of Prebeg's 46%.

The district court, "having examined the various agreements, and the spirit behind the documents determine[d] that the last arrangement, even though Scott Clearman did not join it, is fair and equitable." The court's two-

page order elaborated no further on its reasons. The court split the $458,367 in expenses—$975 to Burnett, $5,183 to Goldstein, $187,557 to PFA, $184,347 to Sommers, and $80,305 to Clearman. It then split the remaining $9,816,633 in fees—$1,963,327 to Burnett (roughly 20 percent), $1,570,661 to G&F (roughly 16 percent), $3,010,428 to PFA (roughly 30 percent), $1,766,994 to Sommers (roughly 18 percent), and $1,505,223 to Clearman (roughly 15 percent).

Clearman filed a motion for entry of findings of fact and conclusions of law and for amendment of the allocation order, which the court denied. He now appeals the allocation of fees. The remaining attorneys who shared the award conditionally cross-appeal—if the allocation has any defect, they argue, it is the over-generous award to Clearman.

## II.

This Court reviews a district court's award of attorney's fees for abuse of discretion.[6] "To constitute an abuse of discretion, the district court's decision must be either premised on an erroneous application of the law, or on an assessment of the evidence that is clearly erroneous."[7] This requires that we decide whether "the record clearly indicates that the district court has utilized the *Johnson* framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation."[8]

## III.

Our resolution of this appeal turns on the district court's statement that it was "unnecessary to engage in determining the reasonableness of the fee and

---

[6] *High Sulfur*, 517 F.3d at 227.
[7] *Id.* (quoting *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)).
[8] *Id.* (quoting *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823 (5th Cir. 1996) (internal quotation marks omitted)).

costs under the *Johnson* fee calculation factors." This statement is at odds with our decision in *High Sulfur* and prevents us from concluding that the district court properly utilized the *Johnson* framework.

In *High Sulfur*, the district court appointed a five-member Fee Committee to allocate an award of attorney's fees among 32 law firms and 79 plaintiffs' attorneys. [9] The Fee Committee presented its proposed allocations in an *ex parte* status conference. None of the other attorneys had notice of this hearing. The proposed order also placed under seal the Fee Committee's documents listing each attorney's award, prohibited the attorneys from disclosing their awarded amounts to anyone, required immediate distribution of fees and costs, and established the district court's process for deciding any objections to the awards.[10] After this 20-minute hearing, the court sealed the hearing transcript and signed the proposed order without modification, which allocated half of the total fee award to the firms of Fee Committee members.[11] On a motion for reconsideration, the court held an *in camera* hearing at which it stated it considered all *Johnson* factors with regard to each attorney.[12]

In *High Sulfur*, we found the procedures used to allocate the lump-sum award wanting and remanded to the district court. As here, the award's allocation, not its sum, was at issue. We noted that while a district court must explain how each of the *Johnson* factors affects its award, it "need not be meticulously detailed," and the court's initial reasonableness assessment was satisfactory.[13] But *High Sulfur* recognized a further duty to monitor the

---

[9] *Id.* at 224.
[10] *Id.* at 224–25.
[11] *Id.* at 226.
[12] *Id.*
[13] *Id.* at 229.

allocation of legal fees, which the district court abdicated by "rubber-stamp[ing] the committee's recommendation."[14]

*High Sulfur* observed two major procedural errors: the first, relevant here, is that the district court offered no factual findings or reasons to support its allocation, and the second, not relevant here, is that the record was sealed without justification.[15] As to the lack of supportive reasoning, the district court's order "merely recite[d] without application the twelve *Johnson* factors and a laundry list of other relevant considerations."[16] Further, the documentation allegedly submitted to the Fee Committee—each attorney's time and expense statements, letters, comments, and hourly billing rates—were absent from the appellate record.[17] This left the record "bereft of factual information essential to the conduct of a *Johnson* analysis as well as appellate review."[18] Committee proposals like that one must "be factually supportable and consistent with the *Johnson* factors."[19]

*High Sulfur* directed that "[o]n remand, the district court shall determine, on an adequate factual record and by application of the *Johnson* factors, the adequacy of the Fee Committee's recommended allocation and the fee requests of any attorneys who choose to object."[20] We also required that "[t]he final award shall be sufficiently supported with written reasons to facilitate judicial review."[21] These statements foreclose Appellees' argument that the *Johnson* framework need not apply at allocation.

---

[14] *Id.*
[15] *Id.* at 229–30.
[16] *Id.* at 229.
[17] *Id.*
[18] *Id.*
[19] *Id.* at 230.
[20] *Id.* at 235.
[21] *Id.*

No. 18-20801

Appellees also cite *High Sulfur*'s endorsement of cases allowing attorneys to split lump-sum awards among themselves by private agreement. If attorneys can self-allocate, they argue, then district courts need not *always* apply *Johnson* in these circumstances. *High Sulfur* rejects this view. There, the Fee Committee attorneys defended the practice of appointed fee committees by citing *Longden*, in which plaintiffs' counsel—save for one objector—split the award among themselves.[22] The objector's award, calculated by applying *Johnson*, was taken from the lump-sum award. Thus, *Longden*

> highlights the district court's duty to scrutinize the allocation of a fee award when an attorney objects to his co-counsels' fee award recommendations. It does not stand for the proposition that courts can delegate their duty to allocate a fee award to a committee of interested attorneys who have reached no agreement among themselves and then approve the allocation after a perfunctory review.[23]

Further, *High Sulfur* was concerned with the *court's* procedures, which were in that case an abdication of traditional judicial oversight. As one district court has noted in distinguishing *High Sulfur*, private fee allocation "take[s] place outside of the judicial process, thus avoiding the Fifth Circuit's concern regarding the use of the judicial process, without meaningful judicial oversight, for a few attorneys to impose a fee allocation on other firms."[24]

Many of the procedural problems present in *High Sulfur*—including the lack of notice afforded other attorneys, the sealed record that prevented the attorneys from comparing their awards and mounting informed challenges to

---

[22] *Id.* at 233–34 (citing *Longden v. Sunderman*, 979 F.2d 1095 (5th Cir. 1992)).

[23] *Id.*

[24] *Edwards v. Nat'l Milk Producers Fed'n*, No. 11-CV-04766-JSW, 2017 WL 3616638, at *10–11 (N.D. Cal. June 26, 2017) (finding formal fee allocation unnecessary where there was no sign of disagreement among the few firms involved).

them, and the missing evidence purportedly submitted to the Fee Committee—are absent here. Still, *High Sulfur* foreclosed fee-allocation orders disclaiming reliance on *Johnson*.[25]

Although *High Sulfur* mandates use of the *Johnson* framework in fee allocations, we stress that even where *Johnson* applies, district courts do not abuse their discretion by omitting a lengthy analysis of each factor. "If the district court has articulated and clearly applied the criteria . . . , we will not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than did the cases from which they arose."[26] Still, we have little choice but to find that the district court abused its discretion in explicitly disclaiming use of the *Johnson* factors.

Nor does it save the award to read the court's statement that the *Johnson* factors were "unnecessary" as applying only to the uncontested fee *sum*, not its *allocation* among the various attorneys. The sole reasoning of record is the recitation that the court, "having examined the various agreements, and the spirit behind the documents determine[d] that the last arrangement, even though Scott Clearman did not join in, is fair and equitable."[27] This does not

---

[25] *See In re Vioxx Prod. Liab. Litig.*, 802 F. Supp. 2d 740, 772 (E.D. La. 2011) (distilling *High Sulfur*'s "takeaway" as requiring that courts conform to traditional standards of fairness by "creating a sufficient record, making sufficient factual findings, considering the time worked and the *Johnson* factors, providing an opportunity to be heard to all the applicants, and exercising independent judgment in allocating those fees rather than simply rubber-stamping a committee recommendation").

[26] *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823 (quoting *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 331 (5th Cir.), *cert. denied*, 516 U.S. 862 (1995)); *see also Moench v. Marquette Transp. Co. Gulf-Inland, L.L.C.*, 838 F.3d 586, 596 (5th Cir. 2016) (citation omitted) (District courts need not "recite or even mention the *Johnson* factors, so long as the record clearly indicates that the district court has utilized the *Johnson* framework as the basis for its analysis.").

[27] Had the district court accepted the latest agreement as to the signees (every attorney save Clearman) and drawn Clearman's award from the lump sum after careful review, this would have approximated the procedure used in *Longden*. Instead, the district court re-inserted Clearman into the agreed split. While the resulting sums may be equitable, this procedure does not square with *High Sulfur*.

reflect the considerations of *Johnson*. Given the disparate positions taken by the vexed attorneys, the size of the award, and the complexities in weighing the attorneys' various contributions, the order is also not "sufficiently supported with written reasons to facilitate judicial review[,]" as *High Sulfur* requires.

That the record does not clearly reflect that the district judge utilized the *Johnson* framework is error. And taking another cue from *High Sulfur*, which opted not to "address whether the individual awards to the Appellants were fair and reasonable[,]" we decline to address the parties' remaining arguments. We have previously remanded in cases where the district court gave no indication it considered *Johnson*.[28] This approach "in no way implies that the attorney's fee award, if justified by a proper explanation, would be an abuse of discretion" but "simply indicates that, without any factual findings, it is impossible to determine whether the district court 'sufficiently considered the appropriate criteria.'"[29]

## IV.

Although sympathetic to the difficult task the lawyers gave to the district court, we must vacate the award allocating attorney's fees and remand for proceedings consistent with this opinion and with due consideration of the *Johnson* factors. While nothing forecloses an agreement among all, its absence leaves no choice but to "do it by the book." The result will be "equitable" but not necessarily the extant result.

---

[28] *Gagnon v. United Technisource, Inc.*, 607 F.3d 1044 (5th Cir. 2010).

[29] *Id.* at 1044 (citing *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 800 (5th Cir. 2006)); *cf. Maverick Indus., Inc. v. Am. Teleconferencing Servs., Ltd.*, 524 F. App'x 99, 103 (5th Cir. 2013) (finding no abuse of discretion where the district court stated little more than that it considered the *Johnson* factors, elaborating slightly on two factors it considered most relevant, because while "[t]he explanation could have been more expansive, . . . it permits us to make a fair evaluation of the reasons for the district court's decision").