# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
February 1, 2023

Lyle W. Cayce
Clerk

No. 21-20642

Gerry Monroe,

*Plaintiff—Appellee*,

*Versus*

Houston Independent School District,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-1991

Before Stewart, Willett, and Oldham, *Circuit Judges*.
Per Curiam:*

　　In this civil rights suit, the district court rendered a final judgment awarding attorney's fees, court costs, and interest to a plaintiff that obtained some, but not all, of the relief he sought against a school district. The school

---

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

district now appeals arguing that the district court erred in calculating the lodestar and abused its discretion when it failed to adjust the lodestar to account for the plaintiff's limited success. Because we hold that the district court did not err in calculating the lodestar or abuse its discretion in declining to adjust the amount, we AFFIRM.

## I. Factual & Procedural Background

Since approximately 2014, Gerry Monroe has served as a self-appointed educational activist and advocate within the Houston Independent School District ("HISD") where he regularly attends monthly board meetings. The events that took place during two of the HISD meetings that Monroe attended in 2019 became the focus of the underlying proceedings in this appeal. First, on April 9, 2019, Monroe attended a reassignment hearing for an HISD employee. At that meeting, he shouted expletives, racial epithets, pounded on the table, insulted the administrators, and stated that he was going to turn the "m*****f***ing school upside down" and "knock out three of [HISD's] principals." Two days later, on April 11, 2019, Monroe attended an HISD board of trustees meeting wearing a grey cap, a bandana covering his entire face except his eyes, and a t-shirt that displayed a large photo of Fonville Middle School Principal Irma Sandate. The captions on the shirt stated that Principal Sandate "must go" because she did not "like black people." When Monroe approached the podium, he spoke loudly and angrily, describing an alleged incident where a teacher at Fonville Middle School brought a gun to school in her purse. He then began shouting and criticizing Principal Sandate for failing to sufficiently address the incident, referring to her as an "idiot" and a "tyrant." Towards the end of his speech, Monroe yelled "Do something with that idiot over there. This is the mandate: Either you take her out or I'm going to take her out." He then made a gesture with his hand that resembled a pointing gun. HISD peace officers addressed Monroe as he was leaving the meeting pursuant to internal policy.

No. 21-20642

In response to the incident, HISD's Business Operations Officer Eugene Salazar sent a letter to Monroe informing him that he was banned from entering all HISD facilities, meetings, and activities and that his entry onto HISD property would be considered trespass. The letter provided that the ban was a "direct result" of Monroe's conduct at the April 11 meeting and also referenced his disruptive behavior at other HISD meetings.

On April 14, 2019, Monroe wrote a letter to HISD appealing the ban and alleging that it violated his First Amendment rights. HISD did not respond and on June 3, 2019, Monroe filed suit in federal district court pursuant to 42 U.S.C. § 1983 alleging that HISD had violated his First and Fourteenth Amendment rights by imposing the facilities ban against him. A week later, Monroe moved for a preliminary injunction seeking to enjoin HISD's enforcement of the ban.

On June 12, 2019, HISD sent a second letter to Monroe reaffirming the facilities ban previously issued and informing him that he could view the HISD meetings online, allow a representative to speak on his behalf, and engage with board members off HISD property. On July 10, HISD sent Monroe a third letter that modified and reduced the term of the facilities ban. The preliminary injunction hearing was then held on July 11 and on July 15, HISD sent Monroe a fourth letter, overriding the third letter's terms, that shortened the duration of the original ban from one year or longer to one that expired by its own terms on December 31, 2019. The letter further specified that during the modified ban's existence, Monroe would be permitted to participate via telephone in any grievance or other administrative proceedings in which he was involved and that he could request permission to schedule an appointment for an in-person meeting. The letter ended by outlining the conduct that HISD considered "inappropriate" for Monroe's future reference. Specifically, the letter provided in pertinent part:

3

No. 21-20642

With respect to your conduct at any of the above activities or at any other meetings or proceedings at HISD facilities or campuses, please be advised that HISD considers that the following conduct does not meet the standard for "appropriate" conduct and also that the following conduct disrupts and interferes with proceedings, as set out in existing HISD policy, including but not limited to HISD Policies BE(LOCAL) and GKA(LEGAL):

- Use of profanity;

- Personal verbal attacks on HISD personnel (*e.g.,* name-calling);
- Making of threats (*e.g.*, "take someone out" or "knock someone out" or "turn a school upside down");
- Use of material to cover or obscure any part of your face while addressing any HISD Board member or employee;
- Wearing clothing containing offensive or derogatory remarks about any HISD Board member or employee;
- Use of any signs, banners, posters, or similar visual aids containing offensive or derogatory remarks about any HISD Board member or employee;
- Use or display of any object that could cause serious bodily injury (*e.g.*, a noose);
- Loud or violent physical gestures such as slamming hands on furniture;
- Threatening physical gestures such as a "finger gun"; and
- Yelling, shouting, or screaming.

You are further advised that if you engage in conduct listed above on HISD property, HISD is fully authorized under existing policies, following a warning that is disregarded, to have you removed immediately from HISD property without further warning or advance notice. You are further advised that if you engage in the above conduct on HISD

property in the future, HISD may be required to issue
additional Criminal Trespass Warnings.

On July 19 the district court issued an order denying the preliminary
injunction motion on grounds that the July 15 letter containing the modified
ban struck an "appropriate balance between the right of schools to address
security concerns and control their premises and [Monroe's] First
Amendment rights."

After the district court denied Monroe the preliminary injunctive
relief he sought, he filed an interlocutory appeal with this court. *See Monroe
v. Houston Indep. Sch. Dist.*, 794 F. App'x 381 (5th Cir. 2019). There, a panel
of this court noted that the issue before the district court at the time of the
preliminary injunction hearing was the facilities ban—not HISD's policy. *Id.*
at 384. Consequently, the panel remanded the case for the district court to
determine in the first instance whether and to what extent Monroe had
adequately alleged a violation of HISD's policy, or HISD's clarification
thereof in the July 15 letter, and whether a preliminary injunction should
issue. *Id.* at 386.

After the proceedings were remanded to the district court, Monroe
filed an amended motion for a preliminary injunction. In his motion, he
sought to enjoin HISD from enforcing the facilities ban and the speech and
expression restrictions listed in the July 15 letter. On December 10, 2019, the
district court held a hearing and the following day, granted in part and denied
in part the motion. The district court first determined by a preponderance of
the evidence that Monroe "meant to communicate a serious expression of an
intent to commit an act of unlawful violence against Principal Irma Sandate"
during the April 11 HISD board meeting and that the limited facilities ban
was a reasonable response to Monroe's threat.

The district court next addressed HISD's speech policies for Monroe
as outlined in the July 15 letter. It reasoned that the First Amendment's

viewpoint neutrality principle protected Monroe's right to express negative views at the HISD meetings because it was permissible for Monroe or other members of the public to express positive views at the meetings. Thus, because HISD's July 15 letter mandated positivity from Monroe, as opposed to the negative speech and expression he desired to convey, it violated his First Amendment right to free speech. Additionally, because the same restrictions were not found in HISD's policies, the July 15 letter improperly established independent restrictions on Monroe's speech and not the speech of others. The district court then preliminarily enjoined HISD from punishing Monroe by removing him from HISD facilities or issuing criminal trespass warnings on the basis of his engaging in the prohibited speech and expression listed in the July 15 letter.

On July 26, 2021, the district court held a bench trial on the sole remaining issue of whether Monroe was entitled to have the terms of the preliminary injunction issued as a permanent injunction. Shortly thereafter on August 4, 2021, the district court issued a memorandum decision and order vacating the preliminary injunction entered on December 11, 2019 and dismissing Monroe's claims as moot. In doing so, it reasoned that Monroe had achieved his objective with HISD's retraction of the unconstitutional restrictions in the July 15 letter, and thus there was no remaining case or controversy between the parties. The court then determined that the case was moot because it was clear from the testimony of various HISD personnel that "the allegedly wrongful behavior could not reasonably be expected to recur." The district court then opined that a reasonable attorney's fee was likely available in the case and took the matter under advisement.

On November 3, 2021, the district court rendered its order on the attorney's fee issue. It first determined that Monroe was a "prevailing party" under 42 U.S.C. § 1988(b) because he had met the requirements under *Dearmore v. City of Garland*, 519 F.3d 517, 524 (5th Cir. 2008). The district

No. 21-20642

court then turned to its calculation of the fee award. After an extensive analysis of Monroe's legal team's itemized billing records using the *Johnson*[1] factors, the district court rendered a total award of $299,200.00, plus court costs and interest.[2] The court declined to increase the lodestar amount by 25% as Monroe's counsel requested, reasoning that the fee award was sufficient as calculated without the enhancement. HISD then appealed the district court's judgment issuing the attorney's fee award.

## II. STANDARD OF REVIEW

"A district court's award of attorney['s] fees is reviewed for abuse of discretion." *Fessler v. Porcelana Corona De Mexico, S.A. DE C.V.*, 23 F.4th 408, 415 (5th Cir. 2022) (citing *Torres v. SGE Mgmt., LLC*, 945 F.3d 347, 352 (5th Cir. 2019)). "A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Id.* (citing *Combs v. City of Huntington*, 829 F.3d 388, 391 (5th Cir. 2016) (citation omitted)).

## III. DISCUSSION

On appeal, HISD argues that the district court erred in calculating the lodestar because it awarded fees for all the time that Monroe's attorneys spent on the litigation, rather than just the time they spent on pursuing successful claims. It also argues that the district court abused its discretion in failing to adjust the lodestar to account for Monroe's limited success since he

---

[1] *Johnson v. Ga. Hwy. Exp., Inc.*, 488 F.2d 714, 717-20 (5th Cir. 1974).

[2] The award included: (1) $262,875.00 for Monroe's lead counsel at a rate of $500/hour for 525.75 hours; (2) $18,600.00 for Monroe's second counsel at a rate of $400/hour for 46.5 hours; and (3) $17,725.00 for Newar's paralegal at a rate of $100/hour for 177.25 hours.

did not recover damages or obtain injunctive relief. We address each of these arguments below.

### A. Calculation of the Lodestar

"A prevailing litigant may not ordinarily collect an attorney's fee from the loser absent some statutory exception." *Combs*, 829 F.3d at 391 (citation omitted). A congressionally-created exception exists, however, in "Title VII of the Civil Rights Act of 1964, which allows a district court to award reasonable attorney's fees to the prevailing party." *Id.* (citing 42 U.S.C. § 2000e-5(k)). Courts apply a two-step method in this circuit for determining a reasonable attorney's fee award. *Id.* at 391–92 (citing *Jimenez v. Wood Cnty.*, 621 F.3d 372, 379 (5th Cir. 2010)). First, the court must calculate the lodestar, "which is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work." *Id.* at 392. In doing so, "[t]he court should exclude all time that is excessive, duplicative, or inadequately documented." *Id.* Second, although the lodestar is presumed reasonable, a court may enhance or decrease it based on the twelve *Johnson* factors.[3] *Id.* "'[T]he most critical factor' in determining a reasonable fee 'is the degree of success obtained.'" *Fessler*, 23 F.4th at 415 (citation omitted). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Id.* at 415–16 (citation

---

[3] *See Cruz v. Maverick Cnty.*, 957 F.3d 563, 574 n.3 (5th Cir. 2020) (quoting *Johnson*, 488 F.2d at 717–19) ("The *Johnson* factors are: (1) 'the time and labor required'; (2) 'the novelty and difficulty of the questions'; (3) 'the skill requisite to perform the legal service properly'; (4) 'the preclusion of other employment by the attorney due to acceptance of the case'; (5) 'the customary fee'; (6) 'whether the fee is fixed or contingent'; (7) 'time limitations imposed by the client or the circumstances'; (8) 'the amount involved and the results obtained'; (9) 'the experience, reputation, and ability of the attorneys'; (10) 'the undesirability' of the case; (11) 'the nature and length of the professional relationship with the client'; and (12) 'awards in similar cases.'" (internal quotation marks omitted)).

omitted). However, once the fee is calculated, "the party seeking modification of the lodestar under the *Johnson* factors bears the burden." *Id.* at 416 (citation omitted).

This court has held that "[i]t is axiomatic that work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved . . . and therefore no fee may be awarded for services on [an] unsuccessful claim." *Fessler*, 23 F.4th at 416 (internal quotation marks and citation omitted). When unsuccessful claims in the lawsuit are unrelated to the successful claims, "the unsuccessful ones must be treated as if they had been raised in separate lawsuits and excluded from the fee award." *Id.* (internal quotation marks and citation omitted). On the other hand, "when claims . . . share a common core of facts or related legal theories, a fee applicant may claim all hours reasonably necessary to litigate those issues." *Id.* (internal quotation marks and citation omitted).

As the district court acknowledged, the parties' primary dispute with respect to attorney's fees arose over the application of two specific *Johnson* factors: (1) the time and labor required, and (2) the customary fee. *See* 488 F.3d at 717–18. The district court stated that, consistent with the guidelines set forth in *Johnson*, *id.* at 717–19, it had "made a detailed line-by-line review of the contemporaneous time records" submitted by Monroe's attorneys and determined that, with their proposed reduction in hours, the attorney time and labor spent on the case were reasonable and necessary to remedy HISD's infringement of Monroe's First Amendment rights. We agree. Although it is true that Monroe did not succeed at every turn in the lawsuit, he did ultimately prevail on obtaining a preliminary injunction and he was able to prove that HISD had violated his constitutional rights when it issued the July 15 letter attempting to restrict his speech and expression at the HISD meetings. As the district court convincingly explained, the claims and steps in litigation leading up to Monroe's ultimate success shared both a "common

core of facts" and "related legal" theories. *Fessler*, 23 F.4th at 416. Consequently, the record supports the district court's conclusion that the time and labor Monroe's attorneys spent on the case was reasonable. *See Fox v. Vice*, 563 U.S. 826, 834 (2011) ("[W]e have made clear that plaintiffs may receive fees under § 1988 even if they are not victorious on every claim. A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes.").

The district court's analysis of the *Johnson* customary fee factor is also supported by the record. This court has acknowledged that a district court's selection of "an appropriate hourly rate" should be "based on prevailing community standards for attorneys of similar experience in similar cases." *Shipes v. Trinity Indus.*, 987 F.2d 311, 319 (5th Cir. 1993). The district court engaged in such an analysis in this case, noting that both of Monroe's attorneys were well-credentialed Houston lawyers with decades of experience litigating civil rights cases. The court also took into account other *Johnson* factors that supported Monroe's counsels' proposed hourly rates such as "the difficulty of litigating constitutional issues that evolved as HISD shifted its position, the experience, reputation, and ability of [Monroe's] counsel, and the undesirability of taking on the civil rights case of a community activist" like Monroe. This method of calculating the customary fee comports with our precedent. As we have explained, "a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case" and "the lodestar method yields a fee that is presumptively sufficient to achieve this objective." *Combs*, 829 F.3d at 392–93. Moreover, "trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox*,

563 U.S. at 838. The district court has achieved that goal in this case and thus did not err in calculating the lodestar. *See Combs*, 829 F.3d at 391.

### B. *Adjustment of Lodestar*

HISD argued at the district court, and continues to argue on appeal, that the district court should have adjusted the lodestar to account for Monroe's limited success. The district court determined, however, that an adjustment was unnecessary. We agree. Once the lodestar is calculated, the court may "determine whether any other considerations counsel in favor of . . . decreasing" it. *Combs*, 829 F.3d at 394–95. Here, the district court's in-depth analysis of the time records submitted by Monroe's attorneys in the context of the *Johnson* factors fully supports its lodestar calculation, including its decision not to adjust, *i.e.*, decrease, the lodestar. Accordingly, we hold that the district court did not abuse its discretion in declining to adjust the lodestar. *Fessler*, 23 F.4th at 415.

## IV. CONCLUSION

We AFFIRM the district court's attorney's fee award in favor of Monroe.